# SUPREME COURT,

## STATE OF KANSAS.

# JULY TERM, 1879.

PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, } Associate Justices.
Hon. DAVID J. BREWER,

---

Geo. W. Veale, *et al.*, v. Susan Maynes.

Title to Indian Lands; *Allotment; Patent.* A certificate of allotment under the treaty of 1861 with the Pottawatomie Indians was issued to A., a member of the family of which B. was the head. Afterward, and under the treaty of 1867, a patent to the same land was issued to B. *Held,* That the full title passed by said patent to B., and that his conveyance carried the same title, and free from all claims and equities in favor of A.

*Error from Shawnee District Court.*

Action in the nature of ejectment, brought by *Susan Maynes* against *George W. Veale* and twenty-five others, to recover possession of a certain tract of land which she claimed by virtue of an allotment to her under the Pottawatomie treaty of 1861. The defendants below, plaintiffs in error here, claimed, under the patentee, Anthony F. Navarre, who, as the head of the family of which the plaintiff below, defendant in error here, was a member, received the patent for the land in controversy as provided for by section six of the treaty of 1867. The case was tried at the April Term, 1876, by the court

1—23 KAS.

without a jury, which made findings of fact and conclusions of law therefrom, and gave judgment for the plaintiff. The defendants bring the case to this court. The facts sufficiently appear in the opinion.

*Peck, Ryan & Johnson,* and *Rossington & Smith,* for plaintiffs in error:

1. The first question, logically as well as chronologically, is: What rights in and to this land were conferred upon the Pottawatomies by the treaty of 1846? We presume that it will be asserted by counsel for the defendant in error, that the treaty of 1846 conferred upon the tribe a title in fee simple. This theory is based upon the language of article 4 of the treaty of 1846, (9 Stat. at Large, p. 853,) by which the United States agree to grant to the tribe "possession and title" to 576,000 acres of land, and to guarantee the "full and complete possession of the same to the Pottawatomie nation as their land and home forever." We suppose it would not be claimed that the above words, in the absence of the word "title," would confer upon the tribe anything more than a mere right of possession and use. It is by that tenure that millions of acres of land have been and are held by the various tribes of the country, until it has become a well-settled principle that the Indian title is a mere possessory one, a usufruct, built upon the fee of the general government.

It would be a tedious task to point out the treaties by which reservations have been established for the use of the different Indian tribes with which the government has had dealings — reservations which have been set apart for their exclusive occupancy, and from which the white man has been excluded by the most stringent penal laws. Words of perpetuity and heirship have been used, by which the whole world has been notified that the land so set apart was to be held, used, owned and occupied by the Indian. And yet it has always been well understood that the Indian title is a mere right of exclusive possession, with the ultimate fee resting in the United States.

As recently as 1877, the supreme court has reasserted the

doctrine that the Indian right to land is a mere possessory one, in the case of *Beecher v. Wetherby*, (95 U. S., 525,) and yet the land in question was described as "*owned* and occupied by the Menominee Indians," and it was "set apart" for their future home. So in the case of *The United States v. Cook*, (19 Wall. 591,) the chief justice, delivering the opinion of the court, said:

"The right of the Indians in the land from which the logs were taken, was that of occupancy alone. They had no power of alienation, except to the United States. The fee was in the United States, subject only to this right of occupancy. This is the title by which other Indians hold their lands. The right of the Indians to their occupancy is as sacred as that of the United States to their fee; but it is only a right of occupancy."

Take the Osage reservation, which was set apart for that tribe by most solemn words of perpetual ownership: The supreme court said, in *Leavenworth, Lawrence & Galveston R. R. Co. v. United States*, (92 U. S., 733:) "That in the free exercise of their choice they might hold it forever;" but they could only *hold* it. The fee was in the United States, subject to the right of the Indians.

But counsel lay great stress on the word "title," in the treaty with the Pottawatomies of 1846, as if by the use of that word the traditionary policy of the government had been overturned, and that tribe had been invested with a different tenure from that by which other tribes hold their lands. Now the word "title" has no special sanctity attached to it. It means simply "that by which one holds possession of lands." So said Lord Coke many years ago, and in that sense it has always been used. The right by which an Indian tribe holds land has been over and over again called its "title" by the supreme court. For instance: In *The United States v. Cook*, (19 Wall., 591,) cited above, the court, speaking of the Indian right of occupancy, says: "This is the *title* by which other Indians hold their land." In treaties and statutes and judicial decisions, the extinguishment of the Indian "title" is constantly spoken of, and yet

nothing more is meant than the extinguishment of the Indian right of occupancy. Can it then be claimed that the use of the word "title," in the treaty of 1846, warrants the conclusion which counsel have insisted upon? It is, however, urged that as the Pottawatomies paid a consideration for the land, they took a fee-simple title. But on examination of the treaties by which reservations have been established from time to time, it will be seen that a consideration of some kind is almost uniformly paid by the Indians. Sometimes it is a cession of other lands; sometimes it is money, and sometimes a release of annuities or claims against the government.

At an early day the government inaugurated the "move-on policy," and it has been pushing the red man further and further toward the setting sun. He is getting scarce in the Atlantic States, where his corn-fields and hunting-grounds were once located. He has moved from reservation to reservation (to all which he had the perpetual right of occupancy)— selling out his old home and buying a new one for himself, and for the young barbarians who were growing up to negotiate other treaties and buy other homes. There is a great deal of human nature in an Indian. Like all thriftless, improvident persons, he likes to do business. He is a born trader, and enjoys a large transaction in land. The treaty of 1846 was a trade of one reservation for another, with a good round sum paid by the government to the tribe as boot-money. It will be seen presently, when we come to consider the treaty of 1861, that neither the government nor the Pottawatomies understood that the treaty of 1846 vested the fee in the tribe, for by that treaty a way was provided for conferring a fee-simple title upon members of the tribe—an utterly senseless thing to do if they already had the fee-simple title. We conclude, therefore, that the treaty of 1846 gave the Pottawatomie tribe the ordinary possessory right by which Indian tribes hold their lands.

2. The next step in the argument is the consideration of the treaty of 1861. The court below held that this treaty

and the action had thereunder, including the issuance of the certificate of allotment, constituted a *grant* of the land in controversy to the defendant in error.   It is manifestly impossible that this conclusion of the court below can be correct if the treaty of 1846 vested the fee-simple title in the tribe, for the reason that there would be nothing left to grant.   The United States, having by the treaty of 1846 parted with all its title, could not grant anything more; and the tribe, having the full and complete title, *in common*, could only have a *partition* among its members, which is not a grant, but a division of lands already granted.   So that the 1846-fee-simple-theory or the 1861-grant-theory must fall.   There isn't sufficient room on the Pottawatomie reservation for both. We venture to suggest that neither is correct.

The treaty of 1861 (12 Stat. at Large, p. 1191) provides in article 1 for a disposition of the Pottawatomie reservation by setting apart, first, a portion of it to those who desire to hold in severalty; second, a portion to those who desire to hold in common; and third, the remaining portion to be sold for the benefit of the tribe.

We come now to article 2.   It is in this article that the court below finds an absolute grant of land to the allottee. Let us examine this article and discover if possible what it means; what intention it manifests on the part of the high contracting powers who negotiated the treaty.   The prime object of the treaty in all of its provisions was the civilization of the tribe.   Article 2 provides for a census of the tribe, to be taken by the agent, showing by classification those who desired to hold in severalty and those who desired to hold in common.   The court will observe that this census was to include the whole tribe—the chieftains big and little, the headmen, the braves, the women and children, the civilized and the uncivilized.   The whole tribe are to "choose" whether they will take in severalty or in common, the adults choosing for themselves, the head of a family for the minor children, and the agent for orphans and persons of unsound mind. When this choosing is finished there is to be *assigned*, under

the direction of the commissioner of Indian affairs, so much to chiefs, so much to head-men, so much to other heads of families, and so much to other persons. If the provisions of article 2 stopped with the above, there would be some force in the assertion that these allotments were intended to separate the tracts which were to be held in severalty, so that each one would hold by an entirely independent tenure, though not by a fee simple. But at this point the *family idea* asserts itself, as it does in almost every Indian treaty. The family is the unit, whose rights and interests are not to be severed. It is presumed that the members thereof will continue to live together under the paternal care of the head of the family. Therefore it is provided in this very article, which is supposed by counsel and the court below to irrevocably sever the rights and interests of the allottees, that the assignments to them are "to include in every case, as far as practicable, *to each family its improvements and a reasonable portion of timber.*" Thus it is clear that in their allotments or assignments the family was considered an entity, the allotments of the different members being grouped around the improvements already made. The family were all to have an interest in the improvements and timber, without regard to whose particular allotment they happened to fall upon. The old man could go and cut timber on the young man's eighty, by virtue of the rights guaranteed to him by the very same article of the treaty which is claimed to give it to the young man in fee simple absolute. The phrase used in article 2 is "to each family"—certainly as strong a phrase as "to each chief," "to each head-man," "to each other person," etc.

The idea that by article 2, allottees took a full and complete title, is quite effectually negatived by the next article of the treaty, which provides how a fee-simple title may be acquired by certain of the allottees. It is plain that if it was intended by article 2 to vest a complete title in the allottees, it would be unnecessary in article 3 to provide *how these same allottees might acquire such title.*

It seems to us that our opposing counsel are driven to the

absurdity of arguing that article 3 was inserted for the purpose of giving allottees something which they already had by virtue of article 2. The truth is, article 3 is an assertion that article 2 did *not* give allottees a fee-simple title, or a full, complete title of any kind. Article 2 leaves the allottees—all of them—in a state of mild and gentle serfdom. An allottee is still under charge of an agent, still a member of the tribe, incapable of selling his land, incapable of exercising any of the great attributes of a free moral agent. What does article 3 do for him? For the average allottee, nothing; nothing for the little allottees, nothing for the female allottees, nothing for the male allottees as such, but for the "head of the family" a great deal. The family principle which appeared in article 2, becomes in article 3 the great central idea. All the other allottees shall remain allottees, but the head of the family is invested, not with a fee-simple title—for that is still in the dim distance—but with the possibility sometime in the future of getting a fee simple. The way is pointed out by which he may, if he will be a good Indian, cease to be a vassal and become a peer; a way by which he may be transformed from a mere occupant of land to an owner in fee with all the dignities and prerogatives which adorn that high estate. By the hard conditions of article 3, he is required, before he can become a fee-simple landed proprietor, to satisfy the president of his intelligence and prudence; he must request the patent; he must appear in court and take the same oath which is required of aliens; he must satisfy the court that he is intelligent and prudent enough to control his own affairs and interests; that he has adopted the habits of civilized life; and has been able for at least five years to support himself and his family. The president may then issue a patent. All these things must he do; all this long road must he travel, all these obstacles must he overcome. In his weariness he might (but don't) cry out with the poet:

> "Ah, who can tell how hard it is to climb
> The steep where Fame's proud temple shines afar?"

Let us look a little further into the provisions of article 3. When all these various steps have been taken by the head of the family, the president may do what? He may "cause the land severally held by them to be conveyed to them by patent in fee simple." Not the lands severally *owned* by them, but *held* by them. He may *convey* to them by patent in fee simple. Why should he *convey*, if the land was already the absolute property of the allottee? And why should he convey *by patent in fee simple*, if the allottee already had that title?

We think that we have shown that the construction of the treaty of 1861, by the court below, is entirely erroneous.

3. The treaty of 1867 is found in 15 Stat. at Large, p. 531. We may state here that between the treaty of 1861 and the treaty of 1867 occurs the treaty of 1866, (14 Stat. at Large, p. 763,) which contains only one article, and simply extends the beneficial provisions of article 3 of the treaty of 1861 to all adults, regardless of sex, whether they are heads of families or not.

The treaty of 1867 has a great deal to say about the lands in controversy. It shows clearly what views were entertained by the Indians and by the government as to the rights of allottees under the treaty of 1861. It is a practical construction of that treaty by the parties themselves, and conclusively demonstrates that they did not consider that it granted an absolute title to the allottees. These allottees, it must be borne in mind, were still members of the tribe, and subject to its laws and regulations as well as to the general paternal control of the general government. They were themselves parties to the treaty by their representatives, and the language of the treaty is their language. The object of the treaty was to secure the removal of the tribe to the Indian territory, and as a prerequisite to such removal, *the disposition of their lands in Kansas.* Those of the tribe who desired to do so, were to go to the new reservation in the territory, and those who desired to remain were to do so, with a view to becoming citizens of the United States.

By article 4, a register of these two classes was provided

for, after the filing of which all restrictions on the alienation of land should be removed from those who should declare their intention of removing to the territory. But it was provided that no person should have the proceeds of the sale either of his own lands or those of his family, except upon the certificate of the agent of his ability to manage his own affairs. Here again the family idea crops out, and the right of the head of the family to manage its affairs. The same article authorizes competent heads of families to negotiate for the sale of the lands of themselves and *families*, and for patents to issue to purchasers. The funds received from such sales are to be deposited in a government depository, to be drawn out as provided in the next article. Let us examine that article, and the understanding of the parties to the treaty as to the rights of allottees will be still more apparent. It provides that the money realized from sales shall be drawn out of the government depository by the agent, and be expended for the benefit of the owner in providing for his removal, *and that of his family*, to the new reservation, and in such articles and for such uses as may with the advice of the business committee be deemed for his best interest at his new home. Thus it appears that the funds realized from the sales of these lands were to be devoted to the support of the *family*, keeping always in view its unity as an integral portion of the tribe.

Then comes article 6, under which the patent to the head of the family is issued. The court below decided that a patent "to the head of a family for the land assigned to a member of the family, is null and void." Let us look at section 6. It is in perfect harmony with the provisions of the treaty of 1861, and with the other provisions of the treaty of 1867. It provides that when heads of families shall become citizens, the families of such persons shall become citizens, and the head of the family shall be entitled to patents and the proportional share of the funds belonging to his family. "Shall be *entitled*" is the language, showing that the head of the family could claim, *as a matter of right*, to have the patent issued to

him. In pursuance of this article, patents were issued; among others, the one in controversy in this case. It has been said over and over again by the courts, that the practical construction put upon a treaty by the executive branch of the government is entitled to great weight. The president issued patents in fee simple. He could not issue any other kind, for away back in 1861, in the third article of that treaty, it had been distinctly provided that the patent should be "in fee simple, with power of alienation." That was the patent which was required to be issued, and which was issued, and if purchasers from the patentee are charged with notice of the treaties behind the patent, then they were distinctly informed that the patentee not only had the fee-simple title, but had "power of alienation," that is, "right to convey."

We have spoken of the practical construction given these treaties by the officers of the government, but the judicial department has construed them the same way. Only a few weeks since, the circuit court of the United States for the district of Kansas, in *Goodfellow v. Muckey*, held that the patent to the head of the family, instead of being null and void, was properly issued to him, and conveyed the legal title.

We believe we have shown that the conclusions of law of the court below, that the treaty of 1861 constituted a grant to the allotees, and that the patent is null and void, are palpably erroneous; and as they are the conclusions upon which judgment was rendered, the decision ought to be reversed.

*Hayden & Hayden*, for defendant in error:

1. There is nothing in the treaty of 1862, or in the supplemental article, which even in the most indirect manner conveys the idea that the head of the family should take all of the lands allotted to his family; on the contrary, the assignment and allotment to Susan Letranch were as distinct from the assignment and allotment to Navarre, as the assignment and allotment to Navarre were distinct from the assignment and allotment to one of the chiefs. Nor can anything be claimed by plaintiffs in error upon this point on the ground

that article 3 of the treaty of 1862 only provided for the issuance of patents to "adults, being males and heads of families," for before the allotments were made that article was amended by the supplemental article, so that its provisions should not be confined to males and heads of families, but should be extended to all adult persons without distinction of sex, whether such persons should be heads of families or otherwise. At the time of the assignment and allotment, then, all persons to whom lands were allotted in severalty stood upon an equal footing with respect to obtaining a patent. All must be or become adults, and satisfy the president that they were sufficiently prudent to control their affairs and interests.

Assuming, in accordance with the views above expressed, that Susan Letranch was the sole beneficiary of the assignment and allotment to her, the next inquiry is: What estate was thereby granted to her? In this connection, it is perhaps material to ascertain the tenure by which the tribe held its reserve in Kansas prior to the treaty of 1862. This reserve had been *bought* and *paid for* by the tribe, pursuant to article 6, of the treaty of June, 1846, which provided: "The United States agree to grant to the said united tribes of Indians *possession and title* to a tract or parcel of land containing," etc., . . . "and to guarantee the full and complete possession of the same to the Pottawatomie nation, parties to this treaty, *as their land and home forever;* for which they are to pay the United States the sum of eighty-seven thousand dollars," etc. (9 Stat. at Large, p. 854.)

We submit that under this treaty of 1846 the tribe became the absolute owners as tenants in common of the tract of land so purchased by them. The ordinary Indian title is the fee simple, but without the power of alienation, except by the consent of the government. (12 Kas. 118; *Worcester v. Georgia*, 6 Pet. 515.)

It will be observed that under the treaty of 1846 no rights were reserved to the United States in the land sold to the tribe; the treaty did not even reserve to the United States the exclusive right of purchasing from the tribe. The Indian title

is property, and alienable unless the treaty has prohibited its sale. (*Doe v. Wilson*, 23 How. 463.)   We claim then that the provision of article 2, of the treaty of 1862, that said tracts should be "set apart for the perpetual and exclusive use and benefit of such assignees and their heirs," is sufficient to vest in the individual allottees an estate in fee simple of the lands so allotted to them. 12 Kas. 409; 4 How. (Miss.) 522; 20 Miss. 425; 1 Washb. Real Property, 69, and cases cited; 2 Serg. & R. 518; 12 Kas. 118; 9 How. 356.

Under the third article of the Pottawatomie treaty of 1832, the tribe ceded to the United States a portion of its lands, excepting certain reservations to certain individuals of the tribe. The language of the reservation was: "The United States agree to grant to each of the following persons the quantity of land annexed to their names, which lands shall be conveyed to them by patent."

In *Doe v. Wilson*, 23 How. 458, 463, the supreme court say: "The Pottawatomie nation was the owner of the possessory right of the country ceded, and all the subjects of the nation were joint owners of it.   The reservees took by the treaty, directly from the nation, the Indian title; and this was the right to occupy, use, and enjoy the lands in common with the United States, until partition was made in the manner prescribed.   The treaty itself converted the reserved sections into individual property.   The nation, as a nation, reserved no interest in the territory ceded; but as a part of the consideration for the cession, certain individuals of the nation had conferred on them portions of the land, to which the United States' title was either added or promised to be added, and it matters not which for the purposes of this controversy for possession."

So in this case, prior to the treaty of 1862, Susan Letranch, in common with the other members of the tribe, held the land here in controversy by an absolute grant under a purchase from the United States, but under the last clause of article 3 of the treaty of 1862, all other allottees to whom lands were assigned in severalty relinquished all their title to this tract,

and under the last clause of article 4 of the same treaty all members of the tribe to whom lands were assigned in common likewise relinquished their title to this tract. She may be said, then, to hold under her original title, strengthened and confirmed by the relinquishment to her of her co-tenants, and ratified by the government in the act agreeing to the reservation; or, as stated by the court in *Doe v. Wilson*, supra, she "took by the treaty, directly from the nation, the Indian title," and this was the perpetual and exclusive right to her and her heirs to use, occupy and enjoy the premises as "her land and home forever." (See also 1 Black, 352; 20 Kas. 394.)

To summarize from the cases already cited, and apply the reasoning of the courts to the facts in this case, we think we are not claiming too much in stating as a conclusion to be deduced from the premises, that since under the Pottawatomie treaty of 1846 the tribe bought and paid for their reservation in Kansas, and the government gave them *possession and title thereto as their land and home forever*, reserving no interest therein; since under the treaty of 1862 Susan Letranch acquired the whole Indian title, with the guaranty on the part of the United States that this title, being perpetual, might be transmitted to her heirs; since the tribe reserved no interest in the land allotted to her, and the government reserved only the right of temporarily regulating the mode of alienation in case she should desire to sell, and guaranteed that as soon as she should become an adult, and satisfy the president that she was sufficiently prudent to control her own affairs, a patent should issue to her removing all restrictions upon her right of alienation, that it follows: 1st, That Susan Letranch was the only individual who acquired any estate in the tract in controversy under the treaty of 1862; 2d, that the estate which she so acquired was a perpetual and inheritable right to occupy and hold to the exclusion of all others; 3d, that the power of free alienation being only an incident to an estate in fee simple, and not an essential requisite, the estate which was vested in her under said treaty of 1862 was

an indefeasible estate of inheritance in fee simple, notwithstanding the temporary restrictions placed upon her power of alienation.

2. If we are right in our conclusions thus far, it follows that the patent issued to Navarre is void, unless it was authorized by the language used in the treaty of 1867, (and, as we think, void even if authorized by the words of that treaty,) for a patent issued for land which has already been granted by treaty is void. 1 Dougl. (Mich.) 560; 9 Pet. 223, 236; 6 Pet. 738; 6 Cranch, 87, 137; 19 Wis. 159. But we claim that the language of the treaty of 1867 did not authorize the issuance of the patent in question to Navarre.

The 6th article of the treaty does not, in terms, refer to the lands previously allotted to minors; and since it does not specify what land or lands shall be patented, something is to be supplied by implication; since this article also provides that the provisions of article 3 of the treaty of 1862 shall continue in force, it follows that the article under consideration must be construed with reference to the provisions of said article 3 of the treaty of 1862. Now, since article 3 of the treaty of 1862 in express terms specifies what land shall be conveyed by patent to the head of the family, viz., *"The land severally held by him,"* and article 6 of the treaty of 1867 does not in terms specify what land shall be conveyed to him by patent, we think it clear that the sense and meaning of these treaty provisions, to be ascertained by comparing one part with another and viewing both articles together, is, as stated in the second conclusion of law of the court below, "That the said treaty of 1867 did not authorize the issuance of the patent to said Anthony F. Navarre." But if we construe said article 6 of the treaty of 1867, with reference to article 3 of the treaty of 1862, *as amended by the supplemental article of March 29, 1866,* as we have the undoubted right to do, how could the construction that the head of the family is entitled to a patent conveying absolutely to him the entire lands of his family be reconciled with the provision of said supplemental article, which in substance is that *each* allottee,

whether male or female, on becoming an adult might obtain a patent for the land severally allotted to him, *whether he be the head of a family or otherwise,* on the same terms, conditions and stipulations as are contained in said third article of the treaty of 1862?

Again, under the rule that the treaty should be so construed that effect be given to every clause and section of it, how can effect be given to the 8th article of the treaty of 1867, if such construction be given to the .6th article of that treaty as to divest the allottee of all rights of property in the land allotted to him? The 8th article, in effect, provides that on the death of the allottee, whether *before* or *after* the treaty of 1867, the rights of heirship to his property shall be decided under the laws of inheritance of the state of Kansas. What property was here contemplated? Clearly the property which had been severally allotted to him. The fact that the supposed intestate was designated by the word "allottee," and that this provision was confined solely to allottees, indicates that the property contemplated in the article was that which had been severally allotted. This article was evidently adopted in recognition of the fact that the land assigned to each allottee in severalty had been set apart to the *exclusive and perpetual use of such allottee and his heirs,* and for the purpose of avoiding all controversy respecting who should be considered heirs to such property in case of the death of the allottee, and seems to clearly indicate that whatever estate the allottee had in the land severally allotted to him previous to the treaty of 1867, should, in case of his death, either before or after that treaty, remain intact in his heirs — a conclusion totally inconsistent with the idea of vesting the title in fee simple in others.

The case here is entirely different from that of *Wilson v. Wall,* 6 Wall., 83, where it was held that the patent having been issued to the head of the family, the vendee of the patentee, purchasing without actual notice, would take the property freed from all equities, if any existed, in favor of the children of the patentee. In that case the patent recites that

the land had been "located in favor of William Hall as *his reserve.*" The words of grant in the patent were: "To William Hall and his heirs," with a *habendum* "to his or their heirs and assigns forever." But even under a patent of that kind it was held in *Pickens v. Harper*, 1 S. & M. (Miss.) Ch. 539, and *Wilson v. Wall*, 34 Ala. 288, that the head of the family took the land in trust for his children. If upon the facts it be held that at the commencement of this action Susan Maynes was the owner of only the equitable title, we contend that such equitable title was paramount to, and stronger than the legal title; for, her title being derived directly from the treaty of 1862, that which constitutes her deed, at the same time constitutes the law which defines her estate, and defines it as *the right to the perpetual and exclusive use and benefit of the premises.* In such case, and in a controversy merely for the possession, it is unnecessary that the grant should be capable of being brought within any of the definitions given to estates by the common law. (28 Mich. 385; 23 How. 458, 463.)

The equitable title being coupled with the right of possession is paramount to the legal title, and is sufficient to entitle her to recover in ejectment. (Code, § 595; 12 Kas. 9, 12; 13 id. 232; 15 id. 9; 23 How. 458, 463; 6 Watts & S. 9; 6 Pa. St. 29; 9 Johns. 298; 16 Kas. 248.)

3. But if we are wrong in every proposition argued by us under the treaty of 1867, and even if the court finds that the words of that treaty would authorize the issuance of a patent conveying in fee simple to the head of the family the entire lands belonging to his family, still we claim that the rights of Susan Letranch could not be affected thereby, for, since under the last clause of article 2, of the treaty of 1862, all other persons to whom lands were alloted in severalty shall be deemed to have relinquished all right to the tract assigned to Susan Letranch; since under article 4 of that treaty all members of the tribe to whom lands were assigned in common shall be deemed to have likewise relinquished all title to this tract, and since these two classes embraced all mem-

bers of the tribe, it follows, that from the time of the assignment of the lands and issuance of the certificates, all of the former title of the tribe to this particular tract was vested in Susan Letranch. As between her and the other members of the tribe at least, it then became her land, and from that time the tribe, as a tribe, had no further interest in or control over this tract. In this view of the case we think it entirely immaterial whether the United States have ever parted with the fee of the land or not, for, since the estate vested in her under the treaty of 1862 gave to her and her heirs the right to the exclusive and perpetual use and benefit of said land, with the right to receive a patent upon complying with certain conditions, which is a sufficient title upon which to maintain ejectment, and since, from and after the issuance of the certificates the tribe retained no community of interest in the lands allotted in severalty, we think it clear that neither the United States nor the tribe retained the power to divest her of the estate which had thus been secured to her and her heirs forever.

If we are correct in this proposition, then even if this court should find that the words of the treaty of 1867 would authorize the issuance of patents in fee simple to the head of a family for the entire lands allotted to such family, it must follow that such provision, being beyond the power at that time vested in either the government or the tribe, is void unless ratified by the individual whose property was thus sought to be transferred to another. That the exercise of such a power by a government would be incompatible with the nature and object of all government, and against the plain and obvious principles of common right, justice and reason, is a proposition which we think must be admitted, even if it were not prohibited by the federal constitution. (18 Wend. 9, 56; 11 id. 149; 4 Hill, 140, 146, 149; 2 Pet. 657; Story on the Const., § 1399; Cooley's Const. Lim., 3d ed., 164, et seq., 175, note 5.)

2—23 KAS.

The opinion of the court was delivered by

BREWER, J.: This is an action in the nature of ejectment, brought by the defendant in error against the plaintiffs in error, to recover possession of a tract of land which she claims by virtue of an allotment to her under the Pottawatomie treaty of 1861. (12 Stat. at Large, p. 1191.) The plaintiffs claim under the patentee, Anthony F. Navarre, who, as head of the family of which defendant in error was a member, received the patent for the land in controversy as provided by section 6 of the treaty of 1867. (15 Stat. at Large, p. 536.) The case was tried by the court without a jury, and the findings of law and fact are embodied in the record. The certificate of allotment for the land in question, issued to the defendant in error, and the patent to Anthony F. Navarre as head of the family, are both recited in full in the findings of fact. The conclusions of law were as follows:

"1. That the said treaty of November 15, 1861, and the action had thereunder, including the issuance of the said certificate by the commissioner of Indian affairs, operated as, and constituted a grant of the land in controversy to said Susan Letranch (now Susan Maynes, plaintiff); to which conclusion of law the said defendants then and there excepted.

"2. That the said treaty of February, 1867, did not authorize the issuance of the patent to said Anthony F. Navarre; to which conclusion of law the said defendants then and there excepted.

"3. That said patent, so issued on the 16th day of May, 1870, to said Anthony F. Navarre, is null and void; to which conclusion of law the said defendants then and there excepted.

"4. That the said plaintiff at the time of the commencement of this action, was and now is the owner of said land and premises in her petition described, and entitled to the immediate and exclusive possession thereof; to which conclusion of law the defendants then and there excepted."

The defendants, being in possession and holding under a patent from the United States, were entitled to judgment unless a better title in the plaintiff was shown; and that better title of necessity implied, not simply an irregularity in the

issue of the patent, for that would be a matter between the government and the patentee, but a want of title in the government, or at least of a right to convey at the time it issued the patent. In other words, it implied the invalidity of the patent because of a prior vesting of either the legal or equitable title in the plaintiff. To determine this question, it becomes necessary to examine the treaties between the government and the Pottawatomie Indians of 1846, 1861, and 1867. By them must be determined the extent of the interest vested in the allottee and the power by treaty between the Indians and the government, to thereafter locate the legal title to the tract covered by the allotment. We quote the various sections which are claimed by counsel to affect this question, premising the quotations by saying that certain rules of construction seem to have become settled concerning Indian treaties and titles, and that the language of the various sections must be construed in the light of these established rules. The treaty of 1846 (9 U. S. Stat., p. 853) provided for concentrating the various bands of the Pottawatomie Indians into one nation, to be known as the Pottawatomie nation, their cession of all lands owned or claimed by them, in consideration of $850,000, to be used or invested, as further specified in the treaty. Section 4 then reads: "The United States agree to grant to the said united tribes of Indians, possession and title to a tract or parcel of land containing . . . and to guarantee the full and complete possession of the same to the Pottawatomie nation, parties to this treaty, as their land and home forever; for which they are to pay the United States the sum of $87,000, to be deducted from the gross sum promised to them in the third article of this treaty." No other provisions of this treaty seem to throw any light on the question. The treaty of 1861, proclaimed April 19, 1862, (12 U. S. Stat., p. 1191,) is the next in order, and contains these sections:

"ARTICLE 1. The Pottawatomie tribe of Indians, believing that it will contribute to the civilization of their people to dispose of a portion of their present reservation in Kansas,

consisting of five hundred and seventy-six thousand acres, which was acquired by them for the sum of $87,000, by the 4th article of the treaty between the United States and the said Pottawatomies, proclaimed by the President of the United States on the 23d day of July, 1846, and to allot lands in severalty to those of said tribe who have adopted the customs of the whites and desire to have separate tracts assigned to them, and to assign a portion of said reserve to those of the tribe who prefer to hold their lands in common; it is therefore agreed by the parties hereto that the commissioner of Indian affairs shall cause the whole of said reservation to be surveyed in the same manner as the public lands are surveyed, the expense whereof shall be paid out of the sales of lands hereinafter provided for, and the quantity of land hereinafter provided to be set apart to those of the tribe who desire to take their lands in severalty, and the quantity hereinafter provided to be set apart for the rest of the tribe in common; and the remainder of the land, after especial reservations hereinafter provided for shall have been made, to be sold for the benefit of said tribe.

"ART. 2. It shall be the duty of the agent of the United States for said tribe to take an accurate census of all members of the tribe, and to classify them in separate lists, showing the names, ages and numbers of those desiring land in severalty, and of those desiring lands in common, designating chiefs and head-men respectively; each adult choosing for himself or herself, and each head of a family for the minor children of such family, and the agent for orphans and persons of an unsound mind. And thereupon there shall be assigned, under the direction of the commissioner of Indian affairs, to each chief at the signing of the treaty, one section; to each head-man, one half-section; to each other head of a family, one quarter-section; and to each other person, eighty acres of land; to include in every case, as far as practicable, to each family, their improvements and a reasonable portion of timber, to be selected according to the legal subdivision of survey. When such assignment shall have been completed, certificates shall be issued by the commissioner of Indian affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they have been assigned respectively, and that said tracts are set apart for the perpetual and exclusive use and benefit of such assignees and their heirs. Until otherwise provided by law, such tracts shall be ex-

empt from levy, taxation, or sale, and shall be alienable in fee, or leased, or otherwise disposed of only to the United States, or to persons then being members of the Pottawatomie tribe, and of Indian blood, with the permission of the president, and under such regulations as the secretary of the interior shall provide, except as may be hereinafter provided. And on receipt of such certificates, the person to whom they are issued shall be deemed to have relinquished all right to any portion of the lands assigned to others in severalty, or to a portion of the tribe in common, and to the proceeds of sale of the same whensoever made.

"ART. 3. At any time hereafter, when the president of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees under the provisions of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at the request of such persons, cause their lands severally held by them, to be conveyed to them by patent in fee simple with power of alienation; and may, at the same time, cause to be paid to them in cash or in the bonds of the United States, their proportion of the cash value of the credits of the tribe, principal and interest then held in trust by the United States, and also, as the same may be received, their proportion of the proceeds of the sale of lands under the provisions of this treaty; and on such patents being issued and such payments ordered to be made by the president, such competent persons shall cease to be members of said tribe, and shall become citizens of the United States; and thereafter the lands so patented to them shall be subject to levy, taxation and sale, in like manner with the property of other citizens: *Provided*, That before making any such application to the president they shall appear in open court in the district court of the United States for the district of Kansas, and make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens, and shall also make proof to the satisfaction of said court that they are sufficiently intelligent and prudent to control their affairs and interests, that they have adopted the habits of civilized life, and have been able to support, for at least five years, themselves and families.

"ART. 4. To those members of said tribe who desire to hold their lands in common there shall be set apart an undivided quantity sufficient to allow one section to each chief, one half-section to each head-man, and one hundred and sixty acres to

each other head of a family, and eighty acres of land to each other person; and said land shall be held by that portion of the tribe for whom it is set apart, by the same tenure as the whole reserve has been held by all of said tribe under the treaty of 1846. And upon such land being assigned in common, the persons to whom it is assigned shall be held to have relinquished all title to the lands assigned in severalty, and in the proceeds of sales thereof whenever made."

The treaty of 1867, proclaimed August 7, 1868, (15 U. S. Stat., p. 531,) provides for securing a home for the Pottawatomies in the Indian country, and the removal thither of such as desire to be removed. The 1st, 2d and 3d sections relate to the selection, payment, etc., of the new reservation. The 4th, 6th and 8th sections, so far as they bear upon the question, are as follows:

"SEC. 4. A register shall be made under the direction of the agent and the business committee of the tribe within two years after the ratification of this treaty, which shall show the names of all members of the tribe who declare their desire to remove to the new reservation, and of all who desire to remain and become citizens of the United States; and after the filing of such register in the office of the commissioner of Indian affairs, all existing restrictions shall be removed from the sale and alienation of lands by adults who shall have declared their intention to remove to the new reservation; but provided that no person shall be allowed to receive to his own use the avails of the sale of his land, unless he shall have received the certificate of the agent and business committee that he is fully competent to manage his own affairs; nor shall any person also be allowed to sell and receive the proceeds of the sale of the lands belonging to his family, unless the certificate of the agent and business committee shall declare him competent to take the charge of their property; but such persons may negotiate for the sales of their property, and that of their families; and any contracts for sales so made, if certified by the agent and business committee to be at reasonable rates, shall be confirmed by the secretary of the interior, and patents shall issue to the purchaser upon full payment, and all payments for such land shall be made to the agent," etc.

"SEC. 6. The provisions of article 3 of the treaty of April 19th, 1862, relative to Pottawatomies who desire to become

citizens, shall continue in force, with the additional provision that before patents shall issue and full payments be made to such persons, a certificate shall be necessary from the agent and business committee that the applicant is competent to manage his own affairs; and when computation is made to ascertain the amount of the funds to the tribe to which such applicants are entitled, the amounts invested in the new reservation provided for in the treaty shall not be taken into account. When any member of the tribe shall become a citizen, under the provisions of said treaty of 1862, the families of said parties shall also be considered as citizens, and the head of the family shall be entitled to patents and the proportional share of funds belonging to his family; and women who are also heads of families, and single women of adult age, may become citizens in the same manner as males."

"SEC. 8 [as amended]. Where allottees under the treaty of 1861 shall have died, or shall hereafter decease, such allottees shall be regarded, for the purpose of a careful and just settlement of their estates, as citizens of the United States and of the state of Kansas; and it shall be competent for the proper courts to take charge of the settlement of their estates, under all the forms and in accordance with the laws of the state, as in the case of other citizens deceased. And in cases where there are children of allottees left orphans, guardians for such orphans may be appointed by the probate court of the county in which such orphans may reside; and such guardians shall give bonds, to be approved by the said court, for the proper care of the person and estate of such orphans, as provided by law."

The starting-point is, of course, the treaty of 1846. By that the first cession of this land was made to the Pottawatomies, and it is claimed that by it something more than the ordinary Indian title was granted to the nation. Stress is laid upon the words "possession and title," and the use of the latter, it is said, implies something more than the mere right of occupancy, for that would pass under the former word. It may be that those words in the language of a grant to a corporation or citizen would imply the grant of the title of the grantor. A contract between individuals to convey title might mean full title. But these words in the treaty must be construed in the light of the recognized relations between the

government and the Indians, and the established policy of the former toward the latter. Title does not necessarily mean title in fee simple; it may mean any kind of title, even the mere title by occupancy. The Indian title has been constantly recognized as simply this inferior title. The government has uniformly asserted its holding of the fee, and has recognized the Indian right as only one of possession. The supreme court reports are full of this doctrine.

In *Doe v. Wilson*, 23 How. 463, the court uses this language: "The United States held the ultimate title, charged with the right of undisturbed occupancy and perpetual possession in the Indian nation, with the exclusive power in the government of acquiring that right." See also *Johnson v. McIntosh*, 8 Wheat. 603.

As recently as 1877, the supreme court, in the case of *Beecher v. Wetherby*, (95 U. S., 525,) has reasserted the doctrine that the Indian right to land is a mere possessory one, and yet the land in question was described as "*owned* and occupied by the Menominee Indians," and it was "set apart" for their future homes. So in the case of the *United States v. Cook*, (19 Wall., 591,) the chief justice, delivering the opinion of the court, said:

"The right of the Indians in the land from which the logs were taken, was that of occupancy alone. They had no power of alienation, except to the United States. The fee was in the United States, subject only to this right of occupancy. This is the title by which other Indians hold their lands. The right of the Indians to their occupancy is as sacred as that of the United States to their fee; but it is only a right of occupancy."

Take the Osage reservation, which was set apart for that tribe by most solemn words of perpetual ownership. The supreme court said, in *Leavenworth, Lawrence & Galveston R. R. Co. v. United States*, (92 U. S., 733,) "That in the free exercise of their choice they might hold it forever," but they could only *hold* it. The fee was in the United States, subject to the right of the Indians.

Now, that the government had power to depart from this

traditionary policy and vest the fee as well as the right of
occupancy in the Indians, is unquestioned, but if a departure
had been intended, words more apt and clear would undoubt-
edly have been used.   There is nothing in the balance of the
treaty to distinguish it from ordinary Indian treaties.   The
tribal existence was fully recognized.   No provision was in
it for changing the relations of the tribe to the government,
or for naturalizing the individual Indian.   There is no re-
striction on the power of alienation, and no reservation to the
government of the sole or prior right of purchase.   So that
if the fee passed, the tribe could the next day have conveyed
full title to an individual, or to any other purchaser, even a
foreign nation.   More than that, the further language of the
section indicates the extent of the intended grant.   It is "to
guarantee the full and complete possession   .   .   .   as their
land and home forever."   But if the fee was granted, the
courts would always protect the title.   Possession was guar-
anteed to the Indians, and not to them and their grantee.   In
short, there is nothing in or about the treaty to indicate that
any other right or title was granted than that "by which
other Indians hold their land," and that is the right or title
of occupancy.

   With this understanding, then, of the import of this treaty,
we pass on to consider the subsequent treaties.   Chronologi-
cally, the treaty of 1861 next demands attention.   This treaty
is a departure.   It was a movement toward the disintegra-
tion of the tribe and the absorption of the individual In-
dians into the body of American citizens.   No universal or
abrupt change was contemplated, and such limitations and
checks were placed as it was thought would sufficiently pro-
tect these wards of the nation from the schemes of the de-
signing.   In carrying out this obvious purpose, three steps
were prescribed: the division of property, the conveyance of
title, and the naturalization of the person.   When these were
accomplished, the individual passed out from tribal control,
and became an American citizen with separate and absolute
property.   Yet by the terms of the treaty (article 3), all this

was possible only for the adult male heads of families. All others, *ex necessitate,* remained within the tribe, bound by its laws and concluded by its treaties, notwithstanding a certain holding of lands in severalty was possible for any and all. The treaty provided for a survey of all the lands and a census of the entire tribe, and then that certain quantities of land be assigned in severalty to those who desired thus to hold, and in common to the remainder. Now what was intended by this division — that the title be thus divided up, or the mere matter of occupancy? Of course either was within the power of the contracting parties. They might provide for a division among the several Indians which should vest an absolute title in each, beyond the power of the tribe or the government to disturb without the personal consent of the individual; or they might provide for an individualizing of the right of occupancy, giving to each person a sole right of occupancy in a particular tract, a right guaranteed against invasion by any individual, but still within the power of the tribe as a tribe to convey by treaty. In other words, while that remained the tribal home each individual desiring it should have separate control of certain lands, yet subject to the ultimate power of the tribe to change their home and to make absolute conveyance of the whole body of lands. The power of the tribe, *as a tribe,* remained undisturbed over both the allotted lands and those held in common. That this was the intent and effect of the treaty, we are constrained to hold, and this notwithstanding many expressions which, if used in ordinary contracts between individuals, would have marked significance to the contrary.

The allottee remained a member of the tribe. We are not advised by anything in the record as to the extent of the power of the tribe over the individual, but whatever that power was, it remained in full vigor over the allottee. There was no separation of the allottee from the nation, and no express restriction upon the power of the tribal authorities to act for him as fully as for any other members of the tribe. And that which thereafter the tribal authorities assumed to

do for him, may well be assumed, in the absence of proof of limitations upon their power, to be within the scope of that power as recognized by the laws and customs of the nation. It must be remembered that, in a large sense, an Indian tribe is to be considered as a foreign nation, and its laws and customs matter of proof, and not to be judicially taken notice of. The powers of the supreme authority differ in different nations, and an act of such supreme authority of a foreign nation should not be presumed to be beyond its powers simply because such an act would be beyond the powers of the supreme authority of our own nation. The full force of this argument will become more apparent when we consider the subsequent treaty of 1867. At present it is enough to notice that the allottee remained a member of the tribe, and if the intention had been to enlarge his title from the ordinary Indian title, one of occupancy, to that of a fee-simple, the intention would, it seems, have been expressed in unmistakable terms. If, on the other hand, a difference was to be made in the mere manner in which the various Indians occupied the tribal home, it was enough that that difference was made clear, and language used to indicate that should not be carried to some further meaning.

If it be said that the allotted tracts were set apart for the perpetual and exclusive use and benefit of the several allottees, and that each allottee relinquished all interest in other allotments as well as in the lands held in common, we reply that these words are no stronger than those which have frequently been used to vest title in an Indian tribe, no stronger than those used in the treaty of 1846 with this same tribe, which we have heretofore noticed. So far as the exclusive benefit is concerned, it was the proffer of an inducement to the allottee to improve his land, in the hope that this incentive would tend toward habits of industry, and consequently civilization. To perfect the guarantee of exclusive benefit, exclusive possession while tribal occupancy remained and receipt of full proceeds of the sale of the separate tract when it was sold, were sufficient. To them no title need be added,

or at least none greater than the ordinary Indian title of exclusive occupancy.

Again, the treaty provided in the 3d article for the conveyance of title. This was made only to those who left the tribe and became citizens. Upon their naturalization, a title in fee simple, with power of alienation, was conveyed; and at the same time their proportion of the personal property of the tribe was transferred. At this time appears the complete separation and individualization. Prior thereto their interest in the lands and personalty was tribal; thenceforward personal. The fact that this provision here appears, tends to support the claim that before this nothing was intended, save a separate occupancy, with the benefit of all improvements personally made. We might notice other matters in the treaty tending in the same direction, but the foregoing are sufficient. This same question has recently been before Judge Foster of the United States Court, and his opinion, concurred in by Judge Dillon, very clearly and forcibly expresses the same conclusion. We quote his language:

"It has been uniformly held by the supreme court that the Indian title was but a right of occupancy, the fee remaining in the United States. (*United States v. Cook*, 19 Wall. 592; *Johnson v. McIntosh*, 8 Wheat. 574; *Worcester v. Georgia*, 6 Pet. 580; *Cherokee Nation v. Georgia*, 5 Pet. 48; *Fletcher v. Peck*, 6 Cranch, 142; 1 Kent's Com. 259.) And unless there is a clear and explicit provision in the treaty, showing that the government intended to make a grant in fee simple, the court will not presume a new departure has been made, or that a different policy from that pursued in the past was intended. Now there is but little in this treaty to justify the court in finding a grant made, or intended to be made, to the allottees. It was undoubtedly the desire of the government to induce the Indians to adopt the modes and habits of civilized life whenever it could be accomplished, and as a step in that direction the plan of allotment in severalty to those of the tribe who had adopted the customs of the whites, and were willing to abandon all claims to the common lands and funds, was adopted. It was optional with the adult Indian to have his land in common with the tribe, or to have it allotted to him in severalty; the

head of the family choosing for the minor children, and the agent for orphans and those of unsound mind.

"It further provides that certificates shall issue to the allottees for the tracts assigned in severalty, specifying the individuals to whom they had been assigned respectively, and that said tracts are set apart for the perpetual and exclusive use and benefit of said assignees and their heirs. The allotted lands were exempt from taxation and sale, and were not alienable by the allottee. That the contracting parties to this treaty did not regard the fee as becoming vested in the allottee by virtue of article 2, and the certificate issued in pursuance thereof, is demonstrated by the next article, for it is therein provided how the adult allottee may obtain that title. It provides in substance that when he should make it appear to the United States district court that he had adopted the habits of civilized life, and that he was sufficiently intelligent and prudent to control his own affairs, and take the oath of allegiance, etc., he could then apply to the president of the United States for a patent, and the president on being satisfied that he was competent to control his own affairs might cause the lands to be *conveyed to him by patent in fee simple with power of alienation;* and when the patent was made and the fund distributed the patentee became a citizen of the United States and ceased to be a member of the tribe, and the lands were subject to taxation, sale, etc. That the contracting parties anticipated that these allotments would ultimately ripen into perfect titles through the proceedings specified in article 3, is altogether probable. But that event might or might not happen."

Passing now to the treaty of 1867, we find that it is between the same contracting parties as that of 1861. Where contracts are entered into between parties, the construction put by the parties themselves in the latter contract upon the provisions of the earlier, is strong evidence of their real scope and effect. Without doubt, as we have seen, there is obscurity in the treaty of 1861. Now within six years the same parties enter into a further treaty concerning the same subject-matter. In so far as in this they put any interpretation upon the provisions of that, it is entitled to great weight. Indeed, except so far as adverse and vested rights are concerned, it might fairly be said to be controlling.

And first it may be noticed that the treaty is with the tribe as a tribe, and concerning the allotted lands as well as those held in common. Notwithstanding the treaty of 1861 had specified that the several allottees should be "deemed to have relinquished all right to any portion of the lands assigned to others in severalty or to a portion of the tribe in common," yet the dealings in 1867 are not separately with each allottee for his tract and with those holding in common for their body of land, but with the tribe as a whole and for all the lands. The very manner of thus dealing shows that the parties thereto did not understand that the treaty of 1861 placed the allotted lands any more than the allottees themselves outside the limits of tribal control. If the legal title, or even a full equitable title, was vested by the allotment in the allottee, then, by our laws at least, no divesting of that title save by the personal assent of the allottee was possible; and any contract therefor would have to be made with each allottee personally. Now without noticing all the various provisions indicating an assumed tribal control, it is enough to refer to article 7, which authorizes in certain cases, and after the lapse of five years, a peremptory sale and removal to the new reservation. It is true, there is a provision for securing to each allottee the benefits of the sale of his allotment. But this is simply carrying out the intent foreshadowed in the treaty of 1861, and heretofore noticed in this opinion, of encouraging each Indian to the improvement of his separate tract by the assurance that the full benefit of his labor and those improvements should inure to himself. Again, article 6 specifically provides that the "head of the family shall be entitled to patents and the proportional share of funds belonging to his family." This is an express provision, and the clearest assertion of the understanding of the parties of the scope and import of their contract in 1861. It is also an assertion of tribal power which, as already suggested, must be assumed to be within such power as recognized by established laws and customs of the tribe. Counsel would have us interpret these words as meaning simply

that the head of the family should be entitled to the custody of the patents issued to the allottee members of his family. But this does violence to the language. The mere custody of the evidence of title would scarcely be dignified with a separate provision in the treaty, and if that were in fact intended, words more apt would assuredly have been used. Clearly the money and the lands which, under the division, would be or had been assigned to the minor members of his family, were to go directly to him. As head of the family he represented it, and to him the treaty intended should it pass whatever was the family share of the tribal property.

In further support of these views, it may be noticed that the action of the ministerial officers of the government has been in the line of this construction of the treaty, and that so far as appears without objection from the tribe. Again, in 1869, an attempt was made by congress to withhold from the head of the family the minors' share of the tribal funds. (16 Stat. at Large, p. 29.) But this act was repealed in 1870, (16 Stat. at Large, p. 370,) as in conflict with the prior treaties. In other words, when the attention of congress was called to the matter, it recognized the fact that by treaty the head of the family was entitled to such funds. If entitled to the funds, why not also to the lands?

Our conclusion then is, that the treaty of 1867 authorized a patent in fee simple to the head of the family of lands prior thereto allotted to the members of his family, and that such provision was not invalidated by any prior treaties or in derogation of any vested rights.

The judgment of the district court will therefore be reversed, and the case remanded with instructions to render judgment on the findings in favor of plaintiffs in error, defendants below.

It is understood that the same question controls the case of *Taylor v. Wilbers;* and the judgment in that case will be affirmed.

All the Justices concurring.