No. 19,104.

F. W. WINTERS, *Appellant,* v. JAMES MYERS, *Appellee.*

SYLLABUS BY THE COURT.

1. TITLE TO ISLANDS IN NAVIGABLE STREAMS. The title to islands formed in navigable streams since the admission of Kansas into the Union is held by the state for the benefit of all the people.

2. SAME—*Legislature May Not Relinquish Such Title to Private Individuals.* The legislature is without power to relinquish the title to such islands to the owners of shore lands without compensation where no public benefit will result from the gift.

3. SAME—*Statute Authorizing Relinquishment of Title to Islands in Navigable Streams is Unconstitutional.* Section 9 of chapter 295 of the Laws of 1913, concerning islands in navigable streams, which provides for such relinquishment or gift when certain conditions exist, violates section 2 of the bill of rights which declares that free governments are instituted for the equal protection and benefit of the people.

Appeal from Reno district court; F. F. PRIGG, judge. Opinion filed May 9, 1914. Reversed.

*F. Dumont Smith,* of Hutchinson, for the appellant.
*C. M. Williams,* of Hutchinson, for the appellee.

The opinion of the court was delivered by

BENSON, J.: This appeal is from a judgment against the plaintiff, who claims to be a settler upon an island in the Arkansas river, which he seeks to purchase as school land.

The land in controversy is situated between the banks of the river as meandered in the United States survey. The north meandered bank is nine feet above the bed of the river, and the old channel next to the bank is from one to two and a half feet above the present bed of the river. This land is south of the old bank, and consists of about 56 acres. The defendant owns certain lots situated immediately north of this

tract and bounded on the south by the river, according to the government survey.  He contends that the tract in question is not an island but is an accretion to his adjoining land.

The evidence on the part of the plaintiff tended to prove the formation of an island commencing in a sand -bar about the year 1875, gradually growing to a connection with the north bank of the river.  On the other hand, evidence on the part of the defendant tended to prove that the defendant's land was gradually extended south by accretion until it embraced the land now in controversy.  Thus a question of fact was presented, whether the land is an accretion to the shore or an island formed in the bed of the river.

The statutes under which the plaintiff made his settlement are chapter 378 of the Laws of 1907 (Gen. Stat. 1909, § 8202), which declared:

"That all islands lying in the navigable streams of this state, wherein the title to said islands is vested in the state of Kansas, may be sold according to the procedure for the sale of state school-lands, and the proceeds of such sale shall become part of the permanent school fund."

The statute was amended by chapter 295 of the Laws of 1913, which provides that:

"SECTION 1.    All islands existing in the navigable streams of this state and being actual islands therein at any time within twenty years prior to the taking effect of this act and not theretofore surveyed under the authority of the government of the United States, and entered under the laws thereof relating to the sale and disposal of public lands, and to which the title is vested in the state of Kansas, may be sold according to the procedure for the sale of state school lands; provided that any person who has heretofore settled upon any such island or any part thereof, under the provisions of the said act to which this is amendatory, but who has not made proof and received a patent therefor from the state of Kansas, or any person who may hereafter settle upon any such island or any part thereof, under the provisions of this act, shall at h's

own expense have an accurate survey of the lands intended to be appropriated by him under such settlement, made by the county surveyor of the county in which such land is situated. . . .

"SEC. 2. Any person who has heretofore settled, or shall hereafter settle upon any such island or a part thereof, for the purpose of purchasing the same as school land, shall within four months after such locating and settlement, or within four months after the taking effect of this act, present his or her affidavit of such settlement, and the plat of survey, and statement and receipt of the county surveyor as provided in section 1 hereof, to the county clerk of the county in which such island is situated, and shall at the same time furnish a bond running to the state of Kansas, signed by one or more sufficient sureties to be approved by the said county clerk, conditioned that such settler shall pay all costs and damages that may be awarded against him or her in any of the subsequent proceedings relating thereto, in case it shall be finally determined that such claimant was not entitled to purchase such tract as school land."

Here follow provisions for an examination of the bond by the county attorney, notice of the settlement and claim to be given by the county clerk by publication at the settler's expense, to adverse claimants who may protest setting up their claims to the land, upon giving bond for costs. The filing of such protest and bond is deemed an appeal, whereupon the county clerk certifies the papers to the district court, where the cause is docketed and stands for trial as an action between the settler as plaintiff, the protestant as defendant, and the state as intervenor, provision being made for intervention by the attorney-general or county attorney, who is required to appear and protect the interests of the state, which is to be considered as a party bound by the final judgment. The statute further provides:

"The word 'island' as used in this act, means and shall be held to be a tract of land which is entirely surrounded by the current of the stream in which it is situated when at its ordinary low stage, and any islands which have been formed and attached to the land or

banks along such streams, and which have not been islands as herein defined during the twenty years last past, are hereby declared to be accretions to and belonging to, and parts of the lots and lands to which they have become attached." (Laws 1913, ch. 295, § 9.)

The plaintiff had settled upon the land before the passage of the amendatory act, but it is admitted that he has also complied with all its requirements. The procedure provided by that act was followed. The defendant filed a protest on the ground that he owned the land, and that it was not subject to settlement and sale as school land. The cause was docketed and tried as an ordinary action. The county attorney filed an intervening petition, and appeared at the trial, but the nature of his contention is not shown in the abstract. The district court placed the burden of proof upon the plaintiff over his objection. The verdict was for the defendant. The judgment is:

"That the defendant James Myers is the owner of and entitled to the immediate possession of all of said lots numbered 1 and 5 and 2 and 3 of section numbered 33, township 23, range 5, Reno county, Kansas, which lots extend down to the present north bank of the Arkansas river, and that the tract of land settled upon by the plaintiff F. W. Winters, as island land in said Arkansas river, is not island land and is not subject to settlement, and that the said F. W. Winters by settlement thereon has acquired no interest in said land whatever; that the state of Kansas has no interest in said land; that all of said land was settled upon by the said F. W. Winters as an accretion to the land of James Myers.

"It is further adjudged that the said.F. W. Winters and the state of Kansas be barred of any right, title or interest in and to said land; that the cost of this action, taxed at $—— be adjudged against the plaintiff, the said F. W. Winters."

Error is assigned upon the order placing the burden of proof upon the plaintiff, and also upon instructions given and refused. As the statute provides that the

27—92 KAN.

settler shall be the plaintiff and the adverse claimant the defendant, it may be fairly inferred that the legislature intended that the burden should be upon the plaintiff, as the court held.

The alleged errors in giving instructions and in refusing to give those requested by the plaintiff present the vital question in this case. Following the statute of 1913, the district court instructed the jury that:

"Under the laws of the state of Kansas the Arkansas river is a navigable stream and the law of Kansas provides that all islands existing in the navigable streams of this state and being actual islands therein at any time within twenty years prior to February 24, 1913, not theretofore surveyed under the authority of the government of the United States, and entered under the laws thereof relating to the sale and disposal of public lands and to which the title is vested in the state of Kansas, may be sold according to the procedure for the sale of state school lands."

The court further instructed that:

"The word 'island' means a tract of land which is entirely surrounded by the current of the stream in which it is situated when at its ordinary low stage.

"The law further provides that any islands which have been formed and attached to the land or banks along such streams, and which have not been islands as above defined during the twenty years, prior to February 24, 1913, are declared to be accretions to and belonging to and parts of the lots and lands to which they have become attached."

The contention of the plaintiff is, first, that by the act of 1907 islands in navigable rivers were set apart to the school fund, and could not be afterwards taken from it, because of the constitutional restriction against diminishing that fund; and second, that even if that restriction does not apply, still, the islands being property of the state, the legislature has no power to give them to the owners of adjacent lands, as the amendatory act in effect attempts to do, where they have been attached to the bank for twenty years.

That islands, according to the usual accepted meaning of that term, formed in navigable rivers since the admission of the state into the Union, were the property of the state, and remained so when the act of 1907 was passed, can not be doubted.

"In Kansas the title to the bed of a navigable river is vested in the state; private owership in bordering land extends only to the river's margin. . . .

"New formations arising from the bed of a river belong to the owner of the bed, and new formations added to a bar or an island in the channel of a river by the process of accretion or reliction belong to the owner of the island or bar." (*Fowler v. Wood,* 73 Kan. 511, 85 Pac. 763, syl. ¶¶ 2, 5.)

If islands were set apart as school lands by the act of 1907 and added to the lands granted by the United States for the support of schools, then they must, under the provisions of section 3 of article 6 of the constitution, be inviolably appropriated to that use. The court, however, is divided upon the question whether they were so set apart, and we proceed to consider whether these islands, even if not appropriated beyond recall to the support of common schools, are subject to disposition in the manner provided by the act of 1913. By that act an island, although once the property of the state, if it had been attached to the shore during the twenty years preceding its passage became the absolute property of the owner of the shore land, by being declared an accretion to that land, whether it was in fact so or not. Thus it appears that if the act be effective in this respect the state must lose, and the riparian owners gain, all the islands to which the statutory conditions apply. Is legislative power adequate to accomplish this?

It must be remembered that patents from the United States conveyed land only to the bank of the river. Beyond the bank grantees obtained no title to the bed of the stream or islands arising out of it. Whatever title the defendant may have in the tract in contro-

versy, if it ever was an island, is derived solely from the act of 1913. The mere fact that the riparian owner's land joins that of the state gives him no title to that land or anything formed or growing upon it. (*Wood v. Fowler*, 26 Kan. 682; *Kregar v. Fogarty*, 78 Kan. 541, 96 Pac. 845; *State v. Nolegs* [Okla. 1914], 139 Pac. 943; *Stevens v. Paterson and Newark R. R. Co.*, 34 N. J. Law, 532.)

The title of the state in such cases is thus defined in *The State, ex rel., v. Akers*, ante, p. 169, 140 Pac. ——:

"Upon her [Kansas] admission [into the Union], absolute property in and dominion and sovereignty over the soils under the navigable and public streams within its limits passed to the state, in trust for all the people, subject to the superior rights of the federal government with respect to navigation." (Syl. ¶ 3.)

It is suggested by the defendant that, having been attached to the main land for twenty years, many difficult questions of evidence might arise as to what part of the accretions belonged to the main land, which evidence must be confined to the memory of living witnesses, and that in view of expense and other difficulties the legislature, to promote the general welfare of the state, might settle these questions once for all and declare that the title to the land should attach to that of the riparian owner after actual connection for twenty years. The proposition that to avoid trouble in maintaining its right the state should surrender to a small number of its citizens valuable property held in trust for all is not persuasive. It must be remembered that this cession is not for public purposes, such as highways or parks, but for purely private benefit and without recompense.

These considerations, however, relate only to the wisdom of the law, and the question is simply one of legislative power. If the act is within the power of the legislature it must be obeyed. The act does not furnish an authority for sales to riparian proprietors

to the exclusion of other purchasers, but provides for relinquishment of the title to them without any consideration.  It is true that the relinquishment or gift provided for is upon the condition that the land had been attached to the shore for twenty years, but when that fact exists the gift is absolute.  If the power existed it might have been exercised without the condition.  If it did not exist, the condition can not supply the authority.

The question therefore remains, whether it is in the power of the legislature to so transfer the title; in other words, to give the islands to the riparian owner. In answering this question we must start with the well-established principle that the statute is valid unless it is in contravention of some express inhibition of the constitution, or one necessarily implied from some express affirmative provision of that instrument. (*Prouty v. Stover, Lieut. Governor,* 11 Kan. 235; *In re Holcomb, Petitioner, &c.,* 21 Kan. 628; *Riley v. Garfield Township,* 58 Kan. 299, 49 Pac. 85; *The State v. Kelly,* 71 Kan. 811, 81 Pac. 450; *Wulf v. Kansas City,* 77 Kan. 358, 94 Pac. 207; *The State v. Weiss,* 84 Kan. 165, 168, 113 Pac. 388.)

Turning to the constitution, we find in section 2 of the bill of rights this provision:

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit."

The same language is found in the Ohio constitution, and it is similar to a clause in the fourteenth amendment to the federal constitution.  In *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.,* 31 Kan. 660, 664, the suggestion that the bill of rights was a compilation of glittering generalities was disapproved.  It was held:

"The bill of rights is something more than a mere collection of glittering generalities; some of its sections are clear, precise and definite limitations on the powers of the legislature and all other officers and agencies of

the state; and while others are largely in the nature of general affirmations of political truths, yet all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm." (Syl. ¶ 1.)

The same subject is referred to in *Schaake v. Dolley,* 85 Kan. 598, 118 Pac. 80.

In *State of Ohio, ex rel., v. Ferris,* 53 Ohio St. 314, 41 N. E. 579, 30 L. R. A. 218, it was held that the same provision of the Ohio constitution invalidated exemptions provided in an inheritance tax law of that state. That decision is cited to illustrate the broad application of this provision in that state, although it was not followed in construing our own inheritance tax law in *The State, ex rel., v. Cline,* 91 Kan. 416, 137 Pac. 932. The opinion in the Ferris case also refers to the similar clause in the fourteenth amendment to the federal constitution, and observes that the clause referred to is no broader than that contained in the Ohio constitution. In *Black v. State,* 113 Wis. 205, 89 N. W. 522, 90 Am. St. Rep. 853, also an inheritance tax case, Justice Winslow uses the following vigorous language in referring to a still more general provision of the constitution of Wisconsin:

"This may be said to be somewhat vague and general—somewhat in the nature of rhetorical flourish; but when it is said that all men equally free have the inherent rights of life, liberty, and the pursuit of happiness, it is certain that it is not meant that some have or may have greater privileges before the law than others. The phrase must mean equality before the law if it means anything.

"The idea is expressed more happily in the fourteenth amendment, where it is said that no state shall deny to any person within its jurisdiction the 'equal protection of the law.' A tax law which makes unjust discrimination—which taxes one person at one rate, and another one, within the same class and under like circumstances, at another rate, or exempts him alto-

gether—denies the equal protection of the laws. This must be self-evident. There may indeed be classification; and if the classification be founded upon real differences, affording rational grounds for a distinction, such classification will not violate the rule of uniformity and equality. So, also, there may be exemption, but the exemption must be reasonable in amount, and founded, also, on rational grounds." (p. 219.)

Thus it appears that in the opinion of the Wisconsin and Ohio courts such general provisions are not mere statements of a general policy, but declaration of affirmative principles which restrict the power of the legislature. In *Hume v. Rogue River Packing Co.*, 51 Ore. 237, 83 Pac. 391, 31 L. R. A., n. s., 396, it was held that an exclusive right of fishing could not be granted to a shore owner in the tideland in front of his property when the constitution provided that "no law shall be passed granting to any citizen privileges or immunities which upon the same terms shall not equally belong to all citizens." (Const. of Oregon, art. 1, § 20.) While this language is quite specific, it only guarantees that "equal protection and benefit" of the law provided for in our bill of rights. The court said:

"So far as this act attempted to vest in the upland or tide land owner the exclusive right to fish in the waters of Rogue River, which was formerly enjoyed and possessed by the public as of common right, we are of the opinion that it would be inoperative and void, as coming within the prohibition of the constitution. . . . Hence the grant to one of an exclusive right to fish would not only create a monopoly in one citizen by taking from others a right of citizenship, but would destroy by the same act a right of property vested in each." (p. 259.)

In *Illinois Central Railroad v. Illinois,* 146 U. S. 387, a statute of Illinois granting to a railroad company title to submerged lands adjoining the lake front in Chicago was held invalid. The opinion discussed at great length the title of the state in the beds of navigable

waters and the rights that individuals and railroad and navigation companies may obtain therein. The doctrine that the state holds the title in such cases in trust for the public was affirmed, and it was said:

"The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, can not be relinquished by a transfer of the property. The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. . . . The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace." (p. 453.)

A note at page 488 of volume 76 of the American State Reports, quoted in the Akers case, *ante,* pp. 169, 205, states the same proposition in forcible terms.

Cases affirming the same principles are cited in volume 8 of the Encyclopedia of United States Supreme Court Reports, title, Navigable Waters. There is, however, a distinction between grants which abdicate the control of navigation and other public uses, such as fisheries and the like, and grants of land held for other purposes which would not have that effect, and this dis-

tinction is referred to in *Illinois Central Railroad v. Illinois,* supra.

Questions similar to those discussed in the opinion from which we have just quoted, and the note referred to, have been considered in Wisconsin. In deciding the effect of a statute purporting to provide for the drainage of a navigable lake, but which it appears would, if valid, transfer title to submerged land to individuals, it was said in *Priewe v. Wisconsin State Land & Imp. Co.,* 103 Wis. 537, 79 N. W. 780, 74 Am. St. Rep. 904:

"The legislature has no more authority to emancipate itself from the obligation resting upon it which was assumed at the commencement of its statehood, to preserve for the benefit of all the people forever the enjoyment of the navigable waters within its boundaries, than it has to donate the school fund or the state capitol to a private purpose. . . . The navigable waters of the state belong to the state, and the lands under them, in all situations, so far as are necessary to preserve inviolate the common right to enjoy those incidents which were not the subject of private ownership in navigable waters at common law." (pp. 549, 550.)

A like conclusion was reached in *Illinois Steel Co. v. Bilot & Wife,* 109 Wis. 418, 430, 84 N. W. 855, 85 N. W. 402, 83 Am. St. Rep. 905. Many other decisions to the same effect might be cited, resting, however, upon the same principle, viz., that the trust upon which such submerged lands are held for the public purposes of navigation, fisheries and the like, can not be relinquished to individuals, at least not without some equivalent public consideration. As decided in the Akers case, the state also holds the title for the benefit of all the people respecting the sand deposits. The principle may be extended to any other like beneficial purpose to which the river, its bed, or islands may be devoted. If it is not necessary to hold an island in the interest of navigation, and it remains subject to disposition, all the people have an interest of the same nature in the proceeds that they would have if the land itself were necessary to facilitate

navigation. The reason the islands may be disposed of as school lands is that they may be thus made available for public benefit, but in this disposition the state necessarily holds the proceeds by the same title as it held the property. This principle was recognized by the legislature in an act relating to the sale of sand and other natural products (Laws 1913, ch. 259, § 5), wherein it is provided that "moneys which are derived from the sale of property taken from school land islands, . . . shall inure to the benefit of the permanent school fund."

The trust is preserved by transference to the proceeds. A disposition which precludes the possibility of proceeds is an abdication of the trust—a legal impossibility. It will not be claimed that the legislature could apply money in the treasury to a use not in any sense public, but for purely private benefit resting upon no legal or equitable right. If that could be done the loss could be made good by taxation, and by indirection taxes might be levied upon all for the benefit of one having no claims upon the public bounty.

In *The State, ex rel., v. Osawkee Township,* 14 Kan. 418, it was held that an act authorizing the issuance of township bonds for the purchase of seed wheat for distribution in districts where there had been a recent failure of crops was beyond legislative power because it would result in taxation for other than public purposes, although the right of taxation for the support of the poor was conceded. Upon the same principle an act of the legislature of this state authorizing municipal bonds to aid a manufacturing enterprise was held unconstitutional. (*Loan Association v. Topeka,* 87 U. S. 655.) The court, by Mr. Justice Miller, said:

"To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms." (p. 664.)

In *Lowell v. Boston,* 111 Mass. 454, 15 Am. Rep. 39, it was held that a legislative act authorizing the issuance of bonds, the proceeds to be loaned to the owners of lands the buildings upon which had been destroyed in the great fire of 1872, was contrary to various provisions of the constitution of that state, resting essentially upon a preceding declaration of rights which stated that:

"Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection; to give his personal service, or an equivalent, when necessary; but no part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people. In fine, the people of this commonwealth are not controllable by any other laws than those to which their constitutional representative body have given their consent. And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." (p. 461.)

There is no real difference in principle between the transfer by taxation of the money of all the people to private benefit, and the transfer of public property by legislative enactment for like private benefit. Indeed the first proposition may be the more meritorious for the taxation referred to is usually attempted in the belief that the aid thereby rendered will result in public benefit, as in the cases cited, by contributing to the production of crops after a general failure; to the increase of trade and manufacture; or to the restoration of buildings greatly needed in continuing the business of a metropolis.

A statute which has the effect of thus transferring the property of all the people, without compensation or public advantage, to a few, denies that equal protection and benefit to the people for which government

is instituted, as declared in the bill of rights. Equal protection is defeated by a gift of that which belongs to all as effectually as by compelling a contribution from all, which, as we have seen, the authorities do not permit. While this protection is usually sought by the few against the many, no reason is perceived why it may not be invoked in behalf of the people at large against legislation which would bestow their property upon the few. This provision of the constitution, as we have seen, while declaring a political truth, does not permit legislation which trenches upon the truth thus affirmed. To this extent at least it must, like other constitutional provisions, be interpreted with sufficient liberality to carry into effect the principles of government which it embodies. (*The State v. Sessions*, 84 Kan. 856, 115 Pac. 641, 22 Ann. Cas. 796.) It is concluded that section 9 of chapter 295 of the Laws of 1913, if held to be operative would have the effect to transfer islands which are the property of the state, held in trust for the benefit of all the people, to the riparian owner without compensation, and is therefore unconstitutional. It follows that the instructions which declared the law to be as stated in the section referred to were erroneous.

Whether the tract in controversy is an island remains to be determined as a question of fact upon proper instructions.

The judgment is reversed and the cause remanded with directions to grant a new trial.

MASON, J. (dissenting) : I agree that the legislature can not give away public property, without legal or moral consideration, merely to enrich an individual. This seems to me to be a necessary corollary of the well-established rule that a tax can not be imposed for any but a public purpose. Money that has been produced by taxation can not be expended for a purely private purpose, and property that could be sold, thereby lessening the amount necessary to be raised by taxation,

would seem to stand on the same footing. The legislature, however, may expend money or convey the property of the state in recognition of moral claims of which a court could take no cognizance. The substantial effect of the statute involved is to declare that the state waives its right to claim certain land to which it may have a legal title, but which for more than twenty years, during which time its value has greatly increased, has been supposed to be private property, has been bought and sold and improved by persons acting in good faith, and held by an adverse possession that would have barred the claim of any one but the sovereign, all with the acquiescence of the public through its officers and representatives, including the legislature. If these conditions existed, and the legislature must be deemed to have so found, I think it was a fair question of legislative policy whether as a matter of honor and morals the state should not relinquish its claims. The legislature may expend money in recognition of a moral obligation (37 Cyc. 723), and in any case admitting of a reasonable difference of opinion the legislative decision that such an obligation exists is not open to review by the courts. A situation quite analogous to that here presented arises where a claim against the public originates under a statute which is later decided to be unconstitutional, and the legislature thereafter undertakes to provide for its payment. An act of congress, appropriating money for the payment of bounties to the manufacturers of sugar, was assailed on the ground that the bounty act itself was void. The supreme court of the United States decided that, assuming the original act to be unconstitutional, congress, under the granted power "to pay the debts" of the nation, could recognize these claims and provide for their payment. The case

has been cited approvingly by a number of state courts. In the opinion it was said:

"The term 'debts' includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a 'debt' to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. . . . In regard to the question whether the facts existing in any given case bring it within the description of that class of claims which Congress can and ought to recognize as founded upon equitable and moral considerations and grounded upon principles of right and justice, we think that generally such question must in its nature be one for Congress to decide for itself. Its decision recognizing such a claim and appropriating money for its payment can rarely, if ever, be the subject of review by the judicial branch of the government." (*United States v. Realty Company*, 163 U. S. 427, 440, 444.)

It would be unconscionable for an individual to claim property as his own, when for twenty years he had allowed others to act upon the supposition that it was theirs. I do not believe the fact that free governments are instituted for the equal protection of their people disables a state from observing in its own conduct the standard applied to individuals of fairness and honor, even to the extent of waiving a right which the law gives it. For the reasons indicated I am persuaded of the validity of the statute in question.