696

**SHORE v. SHELL PETROLEUM CORPO-RATION et al., and four other cases.**

**Nos. 533, 534, 540, 541.**

District Court, D. Kansas, Second Division.

Dec. 23, 1931.

F. Dumont Smith and Eustace Smith, both of Hutchison, Kan., and F. M. Rogers, H. W. Goodwin and John Bradley, all of Wellington, Kan., for plaintiffs.

Roland Boynton, Atty. Gen., John G. Egan, Asst. Atty. Gen., and Benj. F. Hegler, of Wichita, Kan., for executive council, State of Kansas.

Thompson, Mitchell, Thompson & Young (by P. G. McElwee) of St. Louis, Mo., for defendant Shell Petroleum Corp.

HOPKINS, District Judge.

These actions involve the question of ownership of the bed of the Arkansas river contiguous to certain upland owned by the plaintiffs.

The several bills of complaint contain practically the same allegations. In each instance the plaintiff alleges and contends that the lands in controversy form a part of land allotted to the Osage Indians by the federal government for a reservation; that the government held the naked title to such lands in trust for the use and benefit of the Osages; that the plaintiff deraigned his title from the Osages through patents of the government; that plaintiff owns and holds these riparian lands with all of the rights appurtenant thereto as held by the Osages, including the ownership of the bed of the river, adjacent to plaintiff's land to the center of the river; that the river is a nonnavigable stream and that the state never had any right or title thereto.

The answers allege, and the defendants contend, that the title to the river bed is in the state of Kansas and has been leased by its officials to the Shell Petroleum Company; deny that the Osages ever had any title to the land or the river bed, but that the purposes of the various treaties between the Osages and the government affecting the lands were to set aside the lands in question and other lands to the Osages as a reservation; that the legal title to the lands was in the government, before patents were issued to plaintiffs' grantors. The answers plead the patents and allege that they contained no provision purporting to convey any portion of the river bed to the patentees; that the river is, and always has been, navigable.

The case stands submitted for final decree. The contentions of the parties present various questions for consideration.

Did the Osage Indians hold title to the river bed? Did plaintiffs deraign their titles from the Osages or directly from the federal government? Did the patents, under which plaintiffs claim, convey any part of the river bed? Does the federal or (local) state law control the construction to be placed on the patents through which plaintiffs claim? This being litigation over property rights between private parties, in which neither the federal government nor the Osages are interested. Was the Arkansas river navigable in Kansas at or prior to the dates of the issuance of the patents, and what effect, if any, does such navigability or nonnavigability have on the claims of the respective parties?

It is strongly argued by the plaintiffs that the treaty of 1825 conveyed to the Osage Indians the full title and ownership of the lands within the reservation, to the Indians, and that this had the effect of conveying to them title to nonnavigable streams within the reservation.

It may be noted that the Osages are members of the Sioux family and as part thereof formerly ranged somewhere in the region including the Allegheny Mountains from the northern line of what is now Pennsylvania to a portion of Northeastern Georgia. They gradually migrated westward before the advancing civilization of the whites, and after occupying other reservations under treaties with the United States, eventually entered into the Treaty of June 2, 1825, 7 Stat. L. page 240, which established what is known as the original Osage Reservation in Kansas. It was a strip of country fifty miles wide north and south and extending from a line twenty-five miles west of the western boundary line of the state of Missouri to a line north and south which ran through a point called the Rock Saline.

Article 1 ceded and relinquished all of the right, title and interest, and claim of the Great and Little Osage Indians in certain lands therein described, to the United States.

Article 2 created the original Osage Reservation and provided: "Article 2. Within the limits of the country, above ceded and

relinquished, there shall be reserved, to, and for, the Great and Little Osage Tribes or Nations, aforesaid, so long as they may choose to occupy the same, the following described tract of land: beginning at a point due East of White Hair's village, and twenty-five miles West of the Western boundary line of the State of Missouri, fronting on the North and South line, so as to leave ten miles North, and forty miles South, of the point of said beginning, and extending West, with the width of fifty miles, to the Western boundary of the lands hereby ceded and relinquished by said Tribes or Nations."

Later came the Treaty of September 29, 1865, 14 Stat. L. page 687.

Article 1 granted and sold to the United States certain lands therein described for the sum of $300,000, which was to be placed to the credit of the tribe in the treasury of the United States and used for certain purposes therein stated.

By article 2 another strip of land twenty miles in width north and south was ceded to the United States to be held in trust and surveyed and sold for their benefit. This article provides: "Article 2. The said tribe of Indians also hereby cede to the United States a tract of land twenty miles in width from north to south, off the north side of the remainder of their present reservation, and extending its entire length from east to west; which land is  *   *   *  to be surveyed and sold for their benefit under the direction of the Commissioner of the General Land-Office, at a price not less than one dollar and twenty-five cents per acre, as other lands are surveyed and sold, under such rules and regulations as the Secretary of the Interior shall from time to time prescribe. The proceeds of such sales, as they accrue, after deducting all expenses incident to the proper execution of the trust, shall be placed in the treasury of the United States to the credit of said tribe of Indians."

The lands, the sale of which was thus provided for, are referred to thereafter in the treaty as "trust lands." The balance of the reservation is thereafter referred to in the treaty as the "diminished reservation."

The land now owned by the plaintiffs, riparian to the Arkansas river, lies within what was formerly this Diminished Reservation.

Articles 15 and 16 of this treaty provided for the possible removal of the Osage Indians from the Diminished Reservation to lands to be acquired for them in the Indian Territory.

Article 15 provided that the Osage Indians might unite with any tribe of Indians at peace with the United States residing in the Indian Territory.

Article 16 provided for the contingency of the Osages' removal to the Indian Territory, in which event the Diminished Reservation should be sold by the United States in the manner provided in relation to the trust lands. It will be seen by reference to article 2, quoted above, that it contains the provision that the trust lands are to be sold "at a price not less than $1.25 per acre." By virtue of the provision in article 16 that the lands in the diminished reservation should be sold in the same manner as provided in relation to the trust lands, the lands in the diminished reservation were thereafter sold for $1.25 per acre. The exact language of article 16 is as follows: "Article 16. It is also agreed by said contracting parties, that if said Indians should agree to remove from the State of Kansas, and settle on lands to be provided for them by the United States in the Indian Territory on such terms as may be agreed on between the United States and the Indian tribes now residing in said Territory or any of them, then the diminished reservation shall be disposed of by the United States in the same manner and for the same purposes as hereinbefore provided in relation to said trust lands, except that 50 per cent. of the proceeds of the sale of said diminished reserve may be used by the United States in the purchase of lands for a suitable home for said Indians in said Indian Territory."

The provisions of article 16 were subsequently carried out, the Great and Little Osages having met in full council and relinquished to the United States all of their rights in the Diminished Reserve on the 10th of September, 1870. The Diminished Reserve was sold in accordance with the terms of said article and certain lands were acquired, with 50 per cent. of the proceeds, from the Cherokee Nation in the Indian Territory, for the Osage Indians. The lands so acquired in the Indian Territory became the lands of the Osage Tribe now located in the state of Oklahoma, formerly in the Indian Territory. Such lands were owned in fee simple, upon certain conditions, by the Cherokee Nation, and the title of the Cherokee Nation to such lands was acquired by the Great and Little Osage Indians. The title of the Cherokee Nation so acquired by the Osages became the subject of litigation in the case of Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60, 64, 67 L. Ed. 140. As that case is cited and much relied upon by the plaintiffs in the present litigation, it is important to bear in mind that the title there

involved was the title of the Cherokee Nation which had passed to the Osages. The title of the Cherokee Nation depended upon different statutes and treaties than did the title of the Osages to the Diminished Reservation in territory now located in the state of Kansas. Here we are confronted with the question as to the title of the Osages to the Diminished Reservation in territory now located in the state of Kansas, with the authority conferred upon the United States to sell such Diminished Reservation, the title held by the United States at the time of the sales, and with the question as to the extent of the title which passed by virtue of the patents issued by the United States in pursuance of such authority.

Did the Osages have title in fee to the land in their reservation in Kansas? I think not. In passing, it may be observed that they obtained their sustenance mainly by hunting, but raised small crops of corn, beans, and pumpkins. Ordinarily, after planting season they left for their summer hunting, and near the end of the summer returned to their villages and gathered their crops. (Holcombe's History of Vernon County, Missouri, 137.) Buffaloes were then abundant in this country. (See Crawford's "Kansas in the Sixties," 14.) A later treaty (1839) provided that the United States should furnish to the Osages a grist and saw mill. The habits, customs, and mode of life of the Osages, living principally by hunting, and raising only slight crops, precludes any theory that they would have utilized the bed of any water course within the reservation. In actual practice they needed and used such water courses only for fishing and hunting.

In Leavenworth, etc., R. Co. v. U. S., 92 U. S. 733, 23 L. Ed. 634, the court, in construing the Osage treaty, held that in negotiating the treaty, neither the Executive Department nor the Indians supposed that any grant attached to the lands. "The fee of the land was in the United States, with the right of occupation, under the treaty, in the Indians. Until this right was relinquished, the occupancy could not be disturbed by any power except that of the United States."

In Missouri, K. & T. Ry. Co. v. Roberts, 152 U. S. 114, 14 S. Ct. 496, 497, 38 L. Ed. 377, the court, in considering the rights of the Osage Nation under their treaty, said: "Though the lands of the Indians were reserved by treaty for their occupation, the fee was always under the control of the government; and when transferred, without reference to the possession of the lands, and without designation of any use of them requiring the delivery of their possession, the transfer was subject to their right of occupancy; and the manner, time, and conditions on which that right should be extinguished were matters for the determination of the government."

The court there held that a grant to the railroad absolute in its terms conveyed the fee and possession, leaving no rights in the Indians.

In Veale v. Maynes, 23 Kan. 1, Justice Brewer speaking for the court said: "As recently as 1877 the supreme court has reasserted the doctrine that the Indian right to land is a mere possessory one, in the case of Beecher v. Wetherby, 95 U. S. 525 [24 L. Ed. 440], and yet the land in question was described as 'owned and occupied by the Menominee Indians,' and it was 'set apart' for their future home."

Further, in the opinion, Justice Brewer discusses the Leavenworth, etc., R. Co. Case, saying: "Take the Osage reservation, which was set apart for that tribe by most solemn words of perpetual ownership. The supreme court said, in Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733 [23 L. Ed. 634], 'that in the free exercise of their choice, they might hold it forever;' but they could only hold it. The fee was in the United States, subject to the right of the Indians. Now, that the government had power to depart from this traditionary policy, and vest the fee, as well as the right of occupancy, in the Indians, is unquestioned; but if a departure had been intended, words more apt and clear would undoubtedly have been used."

This Veale Case involved the Pottawatomies. The court, in speaking of the Treaty with the Pottawatomies, said: "Stress is laid upon the words 'possession and title,' and the use of the latter, it is said, implies something more than the mere right of occupancy, for that would pass under the former word. It may be that those words in the language of a grant to a corporation or citizen would imply the grant of the title of the grantor. A contract between individuals to convey title might mean full title. But these words in the treaty must be construed in the light of the recognized relations between the government and the Indians, and the established policy of the former towards the latter. Title does not necessarily mean title in fee-simple; it may mean any kind of title, even the mere title of occupancy. The Indian title has been constantly recognized as simply this inferior title. The government has uniformly assert-

ed its holding of the fee, and has recognized the Indian right as only one of possession. The supreme court reports are full of this doctrine."

The contention of plaintiffs that the Indians had title to the river bed cannot be sustained. They had, in my opinion, merely the right of occupancy. When they surrendered this occupancy, their title was extinguished. The fact that the government thereafter saw fit to sell the lands and turn over the money to the Indians does not change the situation. It is therefore apparent that the Osage Tribes had no fee rights prior to statehood, and had relinquished their right of occupancy before the issuance of patents to plaintiffs' grantors (relinquishment, September 10, 1870; patents 1872).

■ Did plaintiffs deraign their title from the Osages or directly from the federal government?

Kansas was admitted as a state January 29, 1861. She "was admitted into the union, on an equal footing with the original states, she succeeded to all the rights of sovereignty, jurisdiction, and eminent domain which Georgia possessed at the date of the cession, except so far as this right was diminished by the public lands remaining in the possession and under the control of the United States, for the temporary purposes provided for in the deed of cession and the legislative acts connected with it. Nothing remained to the United States, according to the terms of the agreement, but the public lands." Pollard's Lessee v. Hagan et al., 3 How. 212, 223, 11 L. Ed. 565.

So, there is no question that Kansas was, by the federal act of admission (12 Stat. 126), granted plenary jurisdiction and power over the beds of streams within her borders and to establish such rules as she deemed proper for the government of riparian rights along such streams.

This was held to be the rule in Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224, where it was held that it is for the states to establish for themselves such rules of property as they may deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent thereto.

The Osage Reservation existed in Kansas at the time of her admission to the Union and so continued, as before stated, until in 1870. At that time the Osages in full council consented to the Act of Congress of July 15, 1870, which provided for their removal from Kansas to lands provided for their permanent home in the Indian Territory and for the sale of their diminished reservation in Kansas. They removed from Kansas to the Indian Territory some time after September 10, 1870, and before June 5, 1872.

■ As before stated, the interest of the Osages in their diminished reservation in Kansas was one of use and occupancy, subject to the control and determination of the United States. The title to the fee of the land in such reservation was in the United States, which had full control of its disposition.

The title to the riparian land along the Arkansas river claimed by the plaintiffs, contiguous to the portion of the bed of the Arkansas river in controversy, is based upon patents from the United States, all dated not earlier than September, 1872. The grantees paid the United States for such land at the rate of $1.25 per acre. These payments were made and the patents issued pursuant to the Act of Congress of July 15, 1870. Sections 12 and 13, c. 296 of 16 Stat. L. pp. 362, 363.

For instance, the plaintiff Shore's title is founded upon a patent from the United States to Ella Champion, dated September 10, 1872. At the top of the patent is this sentence, "Osage trust lands certificate No. 1242." The patent contains this recital:

"Whereas, Ella Champion, of Sumner County, Kansas, has deposited in the General Land Office of the United States a certificate of the register of the land office at Augusta, Kansas, whereby it appears that full payment has been made by the said Ella Champion according to the provisions of the Act of Congress of the 24th of April, 1820, entitled, 'An act making further provision for the sale of the public lands,' and the twelfth section of the acts of 15th of July, 1870, for the lot numbered seven, of section twenty-five, and the south half of the northeast quarter of section twenty-six, in township thirty-one south, of range two east, in the district of lands formerly subject to sale at Augusta, now Wichita, Kan., containing ninety-eight acres and thirty hundredths of an acre, according to the official plat of the survey of the said lands, returned to the General Land Office by the Surveyor General, which said tracts have been purchased by the said Ella Champion.

"Now, know ye: That the United States of America, in consideration of the premises, and in conformity with the several acts of Congress in such cases made and provided, have given and granted and by these presents do give and grant, unto the said Ella Cham-

pion and to her heirs, the said tracts above described; to have and to hold the same, together with all the rights, privileges, immunities and appurtenances, of whatsoever nature thereunto belonging, unto the said Ella Champion and to her heirs and assigns, forever."

Patents from the federal government on which other plaintiffs' claims are based were in substantially the same language.

In the Wenrich case plaintiff's title is founded upon a patent from the state of Kansas for school land, dated April 4, 1884. It reads:

### "School Patent.

"The State of Kansas, to all to whom these presents shall come—greeting:

"Whereas, D. P. Hurst purchased from the county treasurer of Sumner County, Kansas, according to the provisions of the act of the legislature of the State of Kansas, approved February 22, 1864, entitled, 'An act to provide for the sale of school lands,' and acts amendatory thereof, the lots No. one (1), two (2), three (3), four (4) and northeast quarter (¼) of northeast quarter (¼) of section thirty-six (36), in township No. thirty-one (31) south, of range No. two (2) east, of the sixth principal meridian, State of Kansas, for the sum of four hundred and sixty-nine 80/100 dollars ($469.80), containing one hundred and fifty-six 60/100 (156.60) acres, which said tract has been purchased by the said D. P. Hurst, and he has paid therefor the full amount of the purchase money and interest as appears from the certificate of the county clerk of Sumner County, Kansas, deposited in the state land office.

"Now, know ye, That the State of Kansas, in consideration of the premises, and in conformity with the said acts of the legislature of the State of Kansas, in such cases made and provided, has given and granted, and by these presents does give and grant unto the said D. P. Hurst and to his heirs the said tract above described; to have and to hold the same, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging unto the said D. P. Hurst and to his heirs and assigns forever.

"In testimony whereof, I, G. W. Glick, governor of the State of Kansas, have caused these letters to be made patent, and the seal of the state to be hereunto affixed. Given under my hand at the city of Topeka the fourth day of April, in the year of our Lord one thousand eight hundred and eighty-four, and of the independence of the United States the one hundred and eighth and of the twenty-fourth year of the state."

▇ From all the facts and circumstances, it is perfectly apparent that plaintiffs deraigned their titles directly from the United States government and state of Kansas, and not from the Osage Indians.

The plaintiffs strongly contend that the Arkansas river was not in fact navigable; that the Indians owned the land—and with it necessarily the river bottom to the thread of the stream—and that they deraigned their title from the Indians.

▇ The difficulty with the argument is that the Indians did not own the fee title, that plaintiffs did not deraign their title from the Indians, and that the question of navigability in fact is not the true test with which we are confronted. It appears to be well settled that where the litigation over property rights is between private parties, the local law regarding navigability controls, and so the question here is, not whether the Arkansas river in Kansas was navigable in fact prior to the issuance of the patents to the riparian owners, but whether under the law and public policy of the state it was deemed to be navigable. The Supreme Court of Kansas has repeatedly held that the Arkansas river was and is navigable. Dana v. Hurst, 86 Kan. 947, 122 P. 1041; Winters v. Myers, 92 Kan. 414, 140 P. 1033; Steckel v. Vancil, 92 Kan. 591, 141 P. 550; State v. Berk, 129 Kan. 645, 284 P. 386; State v. Akers, 92 Kan. 169, 140 P. 637. These decisions have been recognized as the law and followed by the federal courts. Jackson-Walker C. & M. Co. v. Hodges (D. C.) 283 F. 457 (cited with approval in the Eighth Circuit by Judge Sanborn in United States v. Holt State Bank, 294 F. 161, 164); Wear v. Kansas, 245 U. S. 154, 38 S. Ct. 55, 62 L. Ed. 214, and Donnelly v. U. S., 228 U. S. 243, 33 S. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710.

Therefore, under the facts of this case there is no question as to whether the Arkansas river is navigable in fact. The question is whether it is a navigable one under the local law of the state of Kansas. Jackson-Walker C. & M. Co. v. Hodges (D. C.) 283 F. 457, and Donnelly v. U. S., 228 U. S. 243, 33 S. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710. In Jackson-Walker C. & M. Co. v. Hodges (D. C.) 283 F. 457, 464, Judge Pollock well said: "It must, I think, be held, in this case, the navigability of the stream in point of fact is not the true test. On the contrary, the true test is whether the Arkansas river at the locus in quo must be regard-

ed as navigable under the local laws of the state of Kansas, as ordained and established for the purpose of the unvarying determination of the property rights of riparian owners along its course through the state. That by the local property rule established in this state; once for all, the title to the bed of the Arkansas river within the state. is vested in the state and not in the adjoining riparian owner."

In the Brewer-Elliott Oil & Gas Co. Case, Chief Justice Taft, in distinguishing other cases, said:

"In government patents containing no words showing purpose to define riparian rights, the intention to abide the state law is inferred. .

"Mr. Justice Bradley, speaking for the court in Hardin v. Jordan, 140 U. S. 371, 384, 11 S. Ct. 808, 838, 35 L. Ed. 428, said: 'In our judgment, the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the state in which the lands lie.'

. "Some states have sought to retain title to the beds of streams by recognizing them as navigable when they are not actually so. It seems to be a convenient method of preserving their control. No one can object to it unless it is sought thereby to conclude one whose right to the bed of the river granted and vesting before statehood, depends for its validity on nonnavigability of the stream in fact. In such a case, navigability vel non is not a local question. In Wear v. Kansas, 245 U. S. 154, 38 S. Ct. 55, 62 L. Ed. 214, Ann. Cas. 1918B, 586, upon which the plaintiffs in error rely, the patent of the United States under which Wear derived title was a grant, made before statehood, to land bordering on the Kansas river without restriction, reservation or expansion. The state tribunal took judicial notice of the navigability of the river, refused to hear evidence thereon, and held that the patent to land on a navigable stream did not convey the bed of the river. The United States by its unrestricted patent was properly taken to have assented to its construction according to the local law. Whether the local law worked its purpose by conclusively determining the navigability of the stream, without regard to the fact, or by expressly denying a riparian title to the bed of a nonnavigable stream, was immaterial. In either view the result there would have been the same."

And, as stated by Mr. Justice Holmes in Wear v. Kansas, supra: "If a State Court takes upon itself to know without evidence whether the principal river of the State is navigable at the capital of the State we certainly cannot pronounce it error. In this aspect it is a question of State law. * * * The fact is of a kind that should be established once for all, not perpetually retried."

Since the United States is not a party to these actions, and since all rights here involved have vested subsequent to statehood, this court is bound by the local law of the state of Kansas.

█ Consequently, the patentees (grantors of plaintiffs) took title subject to the laws of the state of Kansas. Wear v. Kansas, 245 U. S. 154, 38 S. Ct. 55, 62 L. Ed. 214. The Brewer-Elliott Oil & Gas Co. decision. is based upon entirely different facts and is not applicable.

█ I am of the opinion that the Osage "Strip" became a part of the state of Kansas upon the admission of Kansas to the Union. U. S. v. Ward, McCahon, 199, Fed. Cas. No. 16,639, U. S. Circuit Ct. for Kan.; Langford v. Monteith, 102 U. S. 145, 26 L. Ed. 53; Utah & N. R. Co. v. Fisher, 116 U. S. 28, 6 S. Ct. 246, 29 L. Ed. 542; Millar v. State, 2 Kan. 174–182. And thus, if the Arkansas river was navigable under Kansas law, the state of Kansas acquired title to the river bed. In any event, if this land did not belong to Kansas before or at statehood, it became such when the Osages relinquished their rights in 1870, two years or more prior to the issuance of the patents through which plaintiffs claim. [11, 12] In Brewer-Elliott Oil & Gas Co. Case, the rights of the Indians (who still held title) was a fee-simple title granted before statehood and specifically granting title to the center of the river. Here, the rights of the plaintiffs vested after statehood, and the patents are silent as to the extent of the grants adjoining the river. In this situation the grant of the patent is presumed to have been made with the assent of the United States that the same shall be construed according to local law. Under local law title to the river bed is in the state, and therefore the patents did not cover the river bed.

In Oklahoma v. Texas, 258 U. S. 586, 42 S. Ct. 406, 414, 66 L. Ed. 771: "Where the United States owns the bed of a nonnavigable stream and the upland on one or both sides, it, of course, is free when disposing of the upland to retain all or any part of the river bed; and whether in any particular instance it has done so is essentially a question of

what it intended. If by a treaty or statute or the terms of its patent it has shown that it intended to restrict the conveyance to the upland or to that and a part only of the river bed, that intention will be controlling; and, if its intention be not otherwise shown, it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies. Where it is disposing of tribal land of Indians under its guardianship the same rules apply."

In Dana v. Hurst, 86 Kan. 947, 122 P. 1041, decided 1911, the court took judicial notice of the fact and decided that the Arkansas river in the state of Kansas, before Kansas became a state and continuing thereafter, has been and is a navigable river; that the title to the bed of said river had become and remained vested in the state of Kansas. That decision has been adhered to by the Supreme Court of Kansas in various cases since. State ex rel. John S. Dawson, Attorney General, v. Akers et al., 92 Kan. 169, 140 P. 637; Winters v. Myers, 92 Kan. 414, 140 P. 1033; Steckel v. Vancil, 92 Kan. 591, 141 P. 550; State of Kansas ex rel. William J. Wertz, County Attorney, v. J. B. Berk, 129 Kan. 645, 284 P. 386.

The state has otherwise given an operative interpretation to this public policy. For instance, she sold many islands or accreted lands located in the Arkansas river and has delivered patents and possession of the same to the vendees or their assignees. The islands or accreted lands thus sold located in the counties of Kearny, Finney, Gray, Ford, Edwards, Pawnee, Barton, Rice, Reno, and Sedgwick. This at intervals from 1912 to 1928.

The state has also issued licenses to various persons, or corporations, to remove sand and gravel from the bed of the Arkansas river in Kansas, in conformity with which sand and gravel have been removed from the Arkansas river.

What was said by Justice Dawson in his dissenting opinion in Webb v. Board of Com'rs of Neosho County, 124 Kan. 38, 257 P. 966, 969, may well be adopted here:

"It has repeatedly been held that the Kansas and the Arkansas rivers are navigable. Wood v. Fowler, 26 Kan. 682, 40 Am. Rep. 330; Dana v. Hurst, supra. How were the facts ascertained in those cases? By testimony of witnesses? Certainly not. The court took judicial notice of the facts, and the federal Supreme Court said that was quite a proper exercise of judicial power. Wear v. Kansas, 245 U. S. 154, 38 S. Ct. 55, 62 L. Ed. 214, Ann. Cas. 1918B, 586. And it was quite well that the court did so, especially in the case of the Arkansas river, for, if the navigability of that stream had been left to the testimony of witnesses and the findings of the jury, supplemented by a court view of the river itself, the public rights in that stream bed would inevitably have been sacrificed. Touching the Arkansas river, also, scientists have noted that its former volume of water has greatly diminished within living memory. See J. R. Meade's article, 'A Dying River,' in volume 14, Transactions, Kansas Academy of Science, 111, 112. But the title to the stream bed, never having been conveyed to private ownership, remains in the state for the public benefit. Dana v. Hurst, supra.

"Some courts have come to realize that the debatable fact of navigability is a very unsatisfactory determinant of the title to the bed of a stream. In Thompson's Title to Real Property, 127 (Bobbs-Merrill, 1919) it is said: 'A division of waters into public and private waters has been adopted in some recent decisions, and undoubtedly the tendency is to extend and assert public rights against private ownership in lakes and rivers, without much regard to any test or definition of navigability.'

"And, since navigation of public streams in Kansas is virtually nonexistent, the further away we get from the times and customs of the historic voyageurs, explorers, and trappers, and their primitive waterborne commerce, the sooner this court abandons all discussion of navigability as a test of title to Kansas river beds the better. The test of navigability is merely an academic stumbling block which needs be gotten rid of. Let us use the more accurate terms of public streams and private streams. If a riparian owner can show title deraigned from the United States or the state of Kansas, the stream bed is his private property. Piazzek v. Drainage District, 119 Kan. 119, 237 P. 1059. If he cannot—if it cannot be shown that the federal or state government has parted with the title thereto—the stream is a public stream, and the bed of that stream is public property.

"Let it be understood that ordinarily the terms 'public stream' and 'navigable stream' are interchangeable terms. I advocate no change in substantive law. I merely urge the adoption of a more precise and less mislead-

ing terminology. Let us say that, where the title to a stream bed has never been conveyed by the state or federal government, this court prefers to designate it as a public stream rather than as a navigable stream, so that every time a question arises touching the navigability of a Kansas stream it will not be necessary to open a judicial kindergarten to teach the history and geography of the American wilderness and the pertinent statutory and other changes in the common law of inland waterways and riparian rights which the new conditions of the wilderness required.

"To the suggestion that private property rights might be affected by such a pronouncement, I reply that, no matter what may have been said in private litigation touching the extent of ownership vested in the riparian owners of meandered streams, the public right therein was never a major issue in any such lawsuit; and certainly the public right could not be foreclosed in any litigation to which the state's responsible representatives were not a party. * * * Of course, wherever a riparian owner can show a valid grant from the state to a stream bed, an island, a sand bar, or the right to bridge or dam a public stream, his property right will be protected."

From what we have said above it appears: First, that the Indians never had any title to the bed of the stream; second, that no matter what the title of the Indians was, the ultimate source of plaintiffs' title is the government's unrestricted patent, in which the Indian title, whatever it was, is completely merged. The patent conveys, not the title of the Indians, but the title of the United States, subject to the implied condition that the patent is to be construed according to the state law.

It is obvious, once the question of the Indian title is eliminated, this case, as to any remaining questions involved, does not differ in any respect from the case of Wear v. Kansas, 245 U. S. 154, 38 S. Ct. 55, 62 L. Ed. 214. Following the rule laid down in that case, we are constrained to hold that the riparian owners have no title to the river bed.

In view of these conclusions and of the further fact that, as pointed out above, the rights of neither the United States nor the Indians are involved in this case, the matter in controversy being purely a litigation between private parties, concerning rights which vested since statehood, it becomes unnecessary for the court to determine, from the evidence introduced on that question, whether the Arkansas river is navigable in fact, according to the tests of navigability established by the decisions of the federal courts.

Under all the facts and circumstances, the plaintiffs and the cross-complainants (Sleigh, Reitz, and Roerick) have clearly failed to show a right of recovery, and judgment will be entered against them and for the defendants.